# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50300

United States Court of Appeals
Fifth Circuit

**FILED**

July 26, 2016

Lyle W. Cayce
Clerk

CYNTHIA HEINSOHN,

      Plaintiff - Appellant

v.

CARABIN & SHAW, P.C.,

      Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:14-CV-94

Before SMITH, WIENER, and GRAVES, Circuit Judges.

WIENER, Circuit Judge:*

Plaintiff-Appellant Cynthia Heinsohn brought this action in Texas court against her former employer, Defendant-Appellee, the law firm of Carabin & Shaw, P.C. ("C&S"). She alleged violations of the Family Medical Leave Act ("FMLA") and the Texas Commission on Human Rights Act ("TCHRA"). C&S removed the action to federal court. Following discovery, both C&S and

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-50300

Heinsohn moved for summary judgment. The magistrate judge recommended granting C&S's motion and denying Heinsohn's. The district court agreed, and entered judgment. Heinsohn now appeals, and we reverse and remand.

## I.
### FACTS & PROCEEDINGS

A.     FACTS

In 2011, C&S hired Heinsohn as a legal assistant and assigned her to work exclusively on Social Security Administration ("SSA") cases. Her wages were $10 an hour, and her responsibilities included (1) updating case notes in C&S's electronic case management system, (2) communicating with clients and with the SSA, and (3) monitoring deadlines.  She was assigned to assist George Escobedo, an "of counsel" lawyer responsible for all SSA cases,[1] and Maria Carvajal, his legal assistant.

Late in 2011, Heinsohn decided to accept a better-paying position with another employer and tendered her resignation to C&S. Escobedo, who "thought she was doing a good job, and . . . didn't want to see her leave," convinced James Shaw, the managing partner of C&S, to raise her pay. He did so, and Heinsohn withdrew her resignation. Her wages eventually rose to $14 an hour.

Heinsohn became pregnant early in 2012. Shortly before she left on maternity leave later that year, Escobedo informed Heinsohn that he would reassign each of her cases to Becky Rendon, another legal assistant in the SSA section. Although it appears that Escobedo requested Heinsohn to perform some specific tasks before she left, it is not entirely clear what those tasks were.

---

[1] When asked whether there was "anybody else working in the Social Security [section] at that time besides you, [Carvajal], and [Escobedo]," Heinsohn responded: "Nobody." When asked "[w]ho would overlook [her] work," she responded: "[I]t was always [Escobedo] and/or [Carvajal]."

No. 15-50300

In their respective depositions, Escobedo and Heinsohn provided differing descriptions of those requests and tasks. The gist, however, appears to be that Escobedo simply requested Heinsohn to complete all outstanding tasks in each of the cases that he had assigned to her. Heinsohn began her maternity leave late in 2012, after telling Escobedo that she had completed all tasks that he had requested.

Within days after Heinsohn's departure, Rendon told Escobedo that, according to the notes in the case management system, deadlines had been missed in some of Heinsohn's cases and good-cause letters had been sent on Escobedo's behalf. Neither Rendon nor Escobedo sought an explanation from Heinsohn.[2] Instead, after reviewing the notes himself, Escobedo informed Tracy Leonard, who assisted with human resources, that it appeared deadlines had been missed by Heinsohn. Leonard then informed Shaw. After speaking with Escobedo, Shaw decided to fire Heinsohn without providing her an opportunity to explain the situation. Approximately two weeks after Heinsohn had begun her maternity leave, Leonard—at Shaw's behest—wrote to Heinsohn, informing her that C&S had terminated her employment. Leonard did not give any reason for firing Heinsohn.

B.   PROCEEDINGS

Early in 2013, Heinsohn filed a claim with the Equal Employment Opportunity Commission ("EEOC"), alleging "sex and retaliation discrimination." C&S responded, asserting that it had nondiscriminatory reasons for terminating her. Heinsohn filed a petition in state court later that year, claiming that C&S had violated the FMLA and the TCHRA. C&S then

---

[2] A good-cause letter is a request that the SSA excuse a missed deadline. It suggests that there was a good, *viz.* legally sufficient, reason for the missed deadline. Such a reason generally exists if a person was not made aware of the deadline to begin with.

No. 15-50300

removed the action to federal court on the basis of the FMLA claim. In so doing, it explained: "Removal of this action is proper because [Heinsohn]'s suit involves a federal question. Specifically, [her] claim arises under [the FMLA]."

In late 2014, after discovery had been conducted, C&S moved for summary judgment. Heinsohn then filed her own motion for summary judgment on the question of liability, which she subsequently corrected. About a week later, Heinsohn responded to C&S's motion for summary judgment. She acknowledged that C&S did not have enough employees to be subject to the FMLA, so she "will withdraw that portion of her claim" against C&S. She also attached a new affidavit, dated December 17, 2014 (the "earlier affidavit"). C&S then moved to strike both the earlier affidavit and various portions of Heinsohn's deposition.

Early in 2015, the magistrate judge granted much of C&S's motion to strike, recommended that C&S's motion for summary judgment be granted, and recommended that Heinsohn's motion for summary judgment be denied. The district court reviewed the motions for summary judgment *de novo* and adopted the magistrate judge's recommendations. In so doing, it refused to consider a new affidavit by Heinsohn, dated February 18, 2015 (the "later affidavit"). The court then dismissed Heinsohn's claims and entered judgment against her. Heinsohn timely appealed to this court.

II.
LAW & ANALYSIS

A.    JURISDICTION

As a preliminary matter, we have "an independent obligation to determine whether-subject matter jurisdiction exists, even in the absence of a

challenge from any party."[3] And, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."[4]

In its notice of removal, C&S asserted that federal question jurisdiction exists under 28 U.S.C. § 1331 because Heinsohn had asserted a federal law claim under the FMLA. Heinsohn, however, later "withdrew" that federal law claim in her memorandum in opposition to C&S's motion for summary judgment after stipulating that C&S might not have enough employees to be covered by the FMLA. In his recommendations, the magistrate judge acknowledged that Heinsohn had withdrawn the claim, and those recommendations were adopted by the district court. Heinsohn's federal law claim was properly dismissed because "stipulations (including those made for purposes of the motion only)" constitute evidence on summary judgment.[5]

Without her federal law claim, Heinsohn's only remaining claim is her state law claim under the TCHRA. And, as she and C&S are both residents of Texas, we must determine whether there is supplemental jurisdiction based on Heinsohn's state law claim alone.

Although the FMLA only applies to employers with a specified minimum number of employees or more, that requirement "is an element of the claim, not a limit upon the federal court's subject-matter jurisdiction."[6] After a court

---

[3] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[4] 28 U.S.C. § 1447(c); *see Arbaugh*, 546 U.S. at 514 ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety.").

[5] FED. R. CIV. P. 56(c)(a); *see Munoz v. Int'l Alliance of Theatrical Stage Emp. & Moving Picture Mach. Operators of U. S. & Canada,* 563 F.2d 205, 213 (5th Cir. 1977) ("Stipulations are a proper evidentiary basis for a summary judgment.").

[6] *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 353 (5th Cir. 2006); *see Arbaugh*, 546 U.S. at 516 ("[W]e hold that the threshold number of employees for

No. 15-50300

dismisses a federal law claim, "[it] generally retains discretion to exercise supplemental jurisdiction . . . over pendent state-law claims."[7] Here, the magistrate judge and district court proceeded to resolve the state-law claim without expressly exercising that discretion. We must do so now.

Generally, "whether a court has subject-matter jurisdiction over a claim is distinct from whether a court chooses to exercise that jurisdiction."[8] "With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise."[9] "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."[10] Although that "determination may be reviewed for abuse of discretion," it "may not be raised at any time as a jurisdictional defect."[11] We therefore consider only whether supplemental jurisdiction exists, not whether the district court erred in failing to consider if it should have exercised that jurisdiction if it does exist.

As noted, C&S alleged a basis for subject matter jurisdiction over the federal law claim, but it did not allege supplemental jurisdiction over the state law claim in its notice of removal.[12] Because the state law claim does not raise

---

application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.").

[7] *Arbaugh*, 546 U.S. at 514 (citing 28 U.S.C. § 1367).

[8] *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009).

[9] *Id.* (citing 28 U.S.C. § 1367).

[10] *Id.* (citing 28 U.S.C. § 1367(c)).

[11] *Id.* at 640 (quoting 16 MOORE'S FEDERAL PRACTICE § 106.05[4] (3d ed. 2009)).

[12] It provided: "Removal of this action is proper because Plaintiff's suit involves a federal question. 28 U.S.C. §§ 1331, 1441(c), 1446(b). Specifically, Plaintiff's claim arises under 29 U.S.C. §§ 2601, *et. seq.*, (FMLA)."

No. 15-50300

a federal question and because the parties are not diverse, we consider *sua sponte* whether supplemental jurisdiction exists.[13] For there to be such jurisdiction, the removing party "must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction." But "if he does not do so, the court, . . . on discovering the [defect], must dismiss the case, unless the defect be corrected by amendment."[14] "[I]t is not sufficient that jurisdiction may be inferred argumentatively from averments in the pleadings, but the averments should be positive."[15]

The notice of removal must therefore "contain[ ] a short and plain statement"[16] describing the basis for subject matter jurisdiction. Usually, "the best practice is for the [removing party] to specifically invoke supplemental jurisdiction and cite to . . . § 1367 in the jurisdictional allegations."[17] But, "as with pleading original jurisdiction, the failure to expressly plead supplemental jurisdiction will not defeat it if the facts alleged in the complaint satisfy the jurisdictional requirements."[18]

---

[13] *See Songcharoen v. Plastic & Hand Surgery Assocs., P.L.L.C.*, 561 F. App'x 327, 332 (5th Cir. 2014) ("Although [the plaintiff]'s federal law claims were later voluntarily dismissed, the Court may continue to exercise supplemental jurisdiction over the state law claims under Section 1367." (internal quotation marks omitted)).

[14] *Smith v. McCullough*, 270 U.S. 456, 459 (1926).

[15] *Hanford v. Davies*, 163 U.S. 273, 279 (1896)

[16] 28 U.S.C. § 1446.

[17] FED. R. CIV. P. 8.

[18] FED. R. CIV. P. 8; *see Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 181 (5th Cir. 1980) ("Regarding the issue of the complaint's deficiency in alleging proper jurisdiction, it is well settled that where a complaint fails to cite the statute conferring jurisdiction, the omission will not defeat jurisdiction if the facts alleged in the complaint satisfy the jurisdictional requirements of the statute.").

No. 15-50300

In such an instance, the otherwise "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts,"[19] as long as such allegations contain only "formal mistakes."[20] We may either (1) remand so the district court can consider whether to allow such an amendment or (2) allow such an amendment without remand if supplemental jurisdiction is otherwise clear from the record.[21]

It is clear from the instant record that Heinsohn's state law claim under the TCHRA is part of the same case or controversy as her now-dismissed federal law claim under the FMLA, so supplemental jurisdiction does exist. C&S, on remand, should be allowed to amend its complaint to assert supplemental jurisdiction under § 1367.

B.     EVIDENTIARY RULINGS

The deferential abuse of discretion standard applies when we review a district court's evidentiary rulings.[22] "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[23] The harmless error doctrine applies to the review of evidentiary rulings, so even if a district court has abused its discretion, we will not reverse unless the error affected "the substantial rights

---

[19] 28 U.S.C. § 1653.

[20] *Nadler v. Am. Motors Sales Corp.*, 764 F.2d 409, 413 (5th Cir. 1985).

[21] *Carlton v. Baww, Inc.*, 751 F.2d 781, 789 (5th Cir. 1985); *see also Booty v. Shoney's, Inc.*, 872 F. Supp. 1524, 1529 (E.D. La. 1995) ("This court finds that supplemental jurisdiction over a derivative claim such as loss of consortium is not an entirely new jurisdictional basis and that Shoney's is allowed to amend its notice of removal to add § 1367 as a jurisdictional basis.").

[22] *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 992 (5th Cir. 2008).

[23] *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010).

No. 15-50300

of the parties."[24] We consider Heinsohn's contentions that (1) the magistrate judge and district court improperly excluded her earlier affidavit, (2) the district court improperly excluded her later affidavit, and (3) the magistrate judge and district court improperly excluded portions of her deposition.[25]

### 1.     EARLIER AFFIDAVIT

Heinsohn contends that the magistrate judge erred in striking the portion of her earlier affidavit in which she stated that C&S fired her because her post-partum recovery would last too long. Heinsohn, however, had no knowledge of C&S's reasons for terminating her, so the magistrate judge did not abuse his discretion in striking this portion of her earlier affidavit.

### 2.     LATER AFFIDAVIT

After the magistrate judge made his recommendations, Heinsohn requested leave from the district court to produce the later affidavit. The district court rejected the later affidavit, in part because Heinsohn provided no reason for her delay in producing it. The court also rejected that affidavit because it was "contradictory to her previous [deposition] testimony." The court noted that in her deposition she had "denied that she missed any deadlines" but in the later affidavit she "state[ed] that *if* there was a missed deadline, she would have told Escobedo about it." The district court rightly observed that Heinsohn provided no reason for her delay in producing the later affidavit, but the court erred in stating that it contradicted her earlier deposition: Heinsohn never denied that deadlines were missed by *someone*; she only denied that deadlines were missed *by her*. Yet, because Heinsohn could very well have

---

[24] *Id.; see also* FED. R. CIV. P. 61.

[25] We also consider below Heinsohn's contention that the magistrate judge and district court improperly excluded evidence that the notes in the case management system were tampered with.

produced this affidavit earlier and did not give any reason for her failing to do so, the district court did not abuse its discretion in striking Heinsohn's later affidavit.[26]

### 3.   DEPOSITION

The magistrate judge wrote that "Heinsohn's deposition testimony is refuted by the e-mail exchange between Heinsohn and Leonard. Heinsohn's assertion that Leonard wanted a guaranteed return date is STRICKEN." "Except as provided in [Federal] Rule [of Evidence] 1002, 'there is no general rule that proof of a fact will be excluded unless its proponent furnishes the best evidence in his power.'"[27] "Application of the [R]ule requires a resolution of the question whether contents are sought to be proved."[28] "[T]hat certain facts are contained in a document does not prevent an affiant from testifying as to those facts from her personal knowledge."[29] Therefore, "[i]t is well-established that Rule 1002 does not apply in situations where the mere existence of an independent factual condition is sought to be proved, even if the condition is contained in or effectuated through a writing."[30] By determining that the e-mail exchange "refuted" Heinsohn's deposition, the magistrate judge improperly considered the veracity of the evidence, rather than its

---

[26]  *See* 28 U.S.C. § 636(b)(1); *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 862 (5th Cir. 2003) (quoting 5 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 1002[01] (1993)).

[27] *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994) (quoting  5 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 1002[01], at 1002–3).

[28] FED. R. EVID. 1002, advisory committee notes.

[29] *F.D.I.C. v. Stringer*, 46 F.3d 66 & n.4 (5th Cir. 1995) ("The Advisory Committee Notes to [Rule] 1002 provide that "an event may be proved by nondocumentary evidence, even though a written record of it was made.").

[30] *United States v. Smith*, 804 F.3d 724, 730 (5th Cir. 2015).

admissibility. Thus, the district court abused its discretion in striking the subject testimony on the basis of the magistrate judge's recommendation.

C.     DISPOSITIVE RULINGS

We review a motion for summary judgment *de novo*.[31] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] All "facts and inferences [must be drawn] in the light most favorable to the party opposing the motion."[33] But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."[34]

The TCHRA prohibits an employer from discriminating against an employee because of the employee's sex,[35] including "discrimination because of or on the basis of pregnancy, childbirth, or a related medical condition."[36] As the TCHRA is partly intended to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,"[37] the "analogous federal statutes and the cases interpreting [those statutes] guide [a court's] reading of the

---

[31] *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012).

[32] FED. R. CIV. P. 56(a).

[33] *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 762 (5th Cir. 2001).

[34] *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

[35] TEX. LAB. CODE ANN. § 21.051 ("An employer commits an unlawful employment practice if because . . . sex, . . . the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . .").

[36] TEX. LAB. CODE ANN. § 21.106(a).

[37] *Id.*

No. 15-50300

TCHRA."[38] An employee "can prove intentional discrimination through either direct or circumstantial evidence."[39] Although the employee's burden of proof remains the same regardless of which evidence the employee uses, the parties' respective burdens of production differ. Heinsohn did not produce any direct evidence of discrimination, but she did produce circumstantial evidence.[40]

When, as here, an employee attempts to use only circumstantial evidence, [41] the parties' respective burdens of production are bifurcated into "intermediate" burdens embodied in the "steps" of the *McDonnell Douglas* framework.[42] Although the employee's "ultimate" burden of *persuasion* or *proof* "remains at all times with the [employee],"[43] the failure of a party to meet its burden of *production* at each step may allow judgment against that party.

1.     THE EMPLOYEE'S BURDEN OF PRODUCTION REGARDING DISCRIMINATION

At the first step of the *McDonnell Douglass* framework, the *employee* must *produce* evidence that, if uncontested by the employer, is sufficient to

---

[38] *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012); *see Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015); *Elliott v. Horizon Healthcare Corp.*, 180 F.3d 264, at \*2 (5th Cir. April 27, 1999).

[39] *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001); *see Evidence;* BLACK'S LAW DICTIONARY (10th ed. 2014) (noting that circumstantial evidence is "also termed indirect evidence"); *see* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS § 3.4 (2014) (referring to "indirect or circumstantial evidence").

[40] This is not to say, however, that a finder of fact may not consider direct evidence on remand.

[41] Circumstantial evidence of discrimination is that "based on inference and not on personal knowledge or observation." *Evidence;* BLACK'S LAW DICTIONARY; *see* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS § 3.4 ("Circumstantial evidence is evidence that proves a fact from which [the finder of fact] can logically conclude another fact exists.").

[42] *Wallace*, 271 F.3d at 219 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate [burden].").

[43] *Burdine*, 450 U.S. 248 at 253.

prove each of the elements of *prima facie* intentional discrimination.[44] As the magistrate judge and district court correctly noted, Heinsohn produced evidence sufficient to prove each of the elements of *prima facie* discrimination. As that evidence was uncontested, she actually *proved* each of those elements, *viz.* (1) she belonged to a protected class because she was pregnant, (2) she was qualified for her position, (3) C&S took an adverse employment action against her by terminating her, and (4) C&S treated employees who were not pregnant more favorably because it replaced her with an employee who was not pregnant.[45] By proving each of these elements with *direct* evidence, Heinsohn produced *circumstantial* evidence that, if uncontested, is also sufficient to prove that C&S had a discriminatory reason for firing her. Having determined that the elements of *prima facie* discrimination exist, the only remaining question is whether C&S had a legitimate, nondiscriminatory reason for its discrimination. The second and third steps of the framework consider this question.

2.     EMPLOYER'S BURDEN OF PRODUCTION REGARDING ITS REASON

In the second step of the *McDonnell Douglass* framework, the *employer* must produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action, apart from the inferred discriminatory reason.[46] Although Heinsohn had the burden of persuasion as to each of the elements of *prima facie* discrimination in the first step, C&S's "burden is one of production,

---

[44] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993).

[45] *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015); *see McLaughlin v. W & T Offshore, Inc.*, 78 F. App'x 334, 338 (5th Cir. 2003) ("[A]lthough [the employee] was not replaced by a single [employee], her duties were delegated to two employees who were not pregnant.").

[46] *Bodenheimer*, 5 F.3d at 957.

not persuasion [*read*: proof]" as to its legitimate, nondiscriminatory reason.[47] In satisfying this burden, C&S "must clearly set forth, through the introduction of admissible evidence, the reasons for [the adverse employment action]."[48] This step "involve[es] no credibility assessment."[49]

C&S met this intermediate burden of production. It produced evidence of legitimate, nondiscriminatory reasons for terminating Heinsohn, which refute or contest Heinsohn's circumstantial evidence of a discriminatory reason. C&S produced Shaw's deposition, in which he averred that C&S terminated Heinsohn because (1) she had missed appeals deadlines, and (2) she had attempted to conceal this by failing to inform Escobedo and by sending good-cause letters without Escobedo's knowledge.[50] Although, by producing this evidence, C&S has rebutted the *presumption* that Heinsohn is entitled to judgment, the attendant *inference*—or circumstantial evidence—of C&S's discriminatory reason remains.[51] When, as here, the employer *does* produce such evidence, the analysis proceeds to the third step.

---

[47] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

[48] *Burdine*, 450 U.S. at 255.

[49] *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("For the burden-of-production determination necessarily precedes the credibility-assessment stage.").

[50] C&S's response to Heinsohn's interrogatory requesting that it "[i]dentify all reasons asserted for the decision to terminate [Heinsohn]" stated: "Upon review of [Heinsohn"s] assigned files it was determined that [Heinsohn] had failed to perform as directed and instructed by her supervisor . . . ." Its supplemental response added: "[A]nd hid [this]."

[51] The magistrate judge erred in holding that C&S had met its burden to produce evidence sufficient to *prove* it had legitimate, nondiscriminatory reasons for terminating Heinsohn. It is not up to C&S to prove that it had a legitimate, nondiscriminatory reason. The magistrate judge also erred in suggesting that Heinsohn had a burden to produce evidence "refuting" C&S's evidence of its legitimate, nondiscriminatory reasons. At this second step of the framework, Heinsohn had no burden to produce evidence of or prove anything.

3.    EMPLOYEE'S BURDEN OF PRODUCTION REGARDING EMPLOYER'S REASON

At the third step, the employee must produce evidence, or rely on evidence already produced, that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason. Stated differently, the employee must produce or rely on evidence that the employer's legitimate, nondiscriminatory reason was only a *pretext*—that is, "[a] false or weak reason . . . advanced to hide the actual . . . reason . . . ."[52] At the last step, "[t]his [intermediate] burden now merges with the ultimate burden of [proving] that [the employee] has been the victim of intentional discrimination."[53] In this sense, "the *McDonnell Douglas* framework [itself]—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*."[54]

Significantly, the third step of the *McDonnell Douglas* framework yields different results, depending on the stage at which it is applied. Once the employee demonstrates that she met her burden of producing or relying on evidence that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason, there is often a genuine issue of material fact as to the veracity of that reason. In the context of a motion for judgment as a matter of law, as in *Reeves v. Sanderson Plumbing Products*, the finder of fact has already resolved this issue of fact at trial, so the court merely tests that finding for sufficiency. In the context of a garden variety motion for summary judgment, however, there has been no trial, so the court has no finding on

---

[52] *Pretext*, BLACK'S LAW DICTIONARY (emphasis added); *see Burdine*, 450 U.S. at 256 ("[T]he proffered reason was not the true reason for the [action].").

[53] *Burdine*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 153 ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the [employee] was the victim of intentional discrimination.").

[54] *Reeves*, 530 U.S. at 142-43 (citations omitted) (internal quotation marks omitted).

which to rely. In the latter context, the genuine issue of material fact precludes summary judgment.

Here, at the summary judgment state, Heinsohn produced evidence sufficient to contest and refute C&S's evidence of a legitimate, nondiscriminatory reason. In so doing, she created a genuine issue of material fact as to whether (1) C&S had a legitimate, nondiscriminatory reason for terminating her or (2) its articulated reason was merely pretextual.

As a preliminary observation, there is little for Heinsohn to refute or contest. C&S produced only scant evidence of a legitimate, nondiscriminatory reason for firing Heinsohn. "As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry."[55] An employer generally will satisfy its burden of production with "contemporaneous written documentation."[56] But contemporaneous written documentation must do more than simply indicate that an employee "violated certain workplace rules."[57]

---

[55] *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 904 (5th Cir. 2012) (quoting *Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004)).

[56] *Laxton v. Gap Inc.*, 333 F.3d 572, 580 (5th Cir. 2003); *see, e.g.*, *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087–88 (5th Cir. 1994) ("[The employer]'s affidavits and contemporaneous evaluation forms are replete with references to [the employee]'s bad knee and poor safety record."). For example, when "[a]ll of the evidence of disciplinary problems comes from memoranda or depositions written or taken after [an employee] was demoted and, in some cases, after [an employee] filed suit," we have noted that "[t]his after-the-fact documentation cannot be evidence to justify a demotion because of disciplinary problems." *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001).

[57] *Turner*, 675 F.3d at 903 ("Although the discharge letters state that [the employees] were found to have violated certain workplace rules, they do not provide any reason for [the supervisor]'s decisions to dismiss these employees: The letters are not signed by [the supervisor]; they do not mention the employees" disciplinary histories; and they do

No. 15-50300

C&S's only contemporaneous evidence of its reason for terminating Heinsohn is the letter in which it stated: "Based on a review of your work, it has been decided that your employment with [C&S] has been terminated as of October 19, 2012." This letter, signed by Leonard, does not indicate that Heinsohn violated any policy or even that her work was flawed or inadequate. Neither does it indicate who decided to terminate her. Instead, C&S relies entirely on *post hoc* evidence of its reason, *viz*, Shaw's deposition, in which he declared that the decision to terminate Heinsohn was his and was based on what Escobedo and Leonard[58] had told him after her maternity had begun:

> [I]t was brought to my attention that while [Heinsohn] was on leave, files were discovered that deadlines were missed. She had not gone to [Escobedo] and told him deadlines were missed, and then apparently there had been some type of attempt by [her] to fix the error, mistakes, or omission on her part, and that was all brought to my attention.

Although Shaw said that "files were discovered" indicating that "deadlines were missed," he did not reference any specific file on which his decision to terminate Heinsohn was based. He averred: "I do not remember which two files I was looking at on that day, but I do remember that it appeared that she had attempted to cover it up." Shaw said that he did not remember asking either Escobedo or Leonard any questions about what had occurred and that he did not ask, nor did he need to ask, Heinsohn any questions.

There may be an explanation for this lack of specificity. There is a genuine issue of material fact as to whether Shaw was Heinsohn's supervisor

---

not give any indication that they reflect [the supervisor]'s reason for choosing to dismiss the employees, as opposed to merely suspending them.").

[58] Notably, Leonard had no personal knowledge of what Heinsohn did or did not do.

and, perhaps, whether he was responsible for terminating her.[59] In his deposition, Shaw stated that he was the direct supervisor of *all* the employees at C&S, including Heinsohn, and that he alone was responsible for firing her. Yet, Heinsohn's deposition evidences that: when she was hired, Escobedo and Carvajal were the only others in the SSA section of C&S; that only Escobedo or Carvajal reviewed her work; that they were her only direct supervisors; and that Escobedo was the only lawyer responsible for any of her cases. Heinsohn further averred that she never had any reason to communicate with Shaw, although she knew who he was and would greet him when "[h]e did come into the office here [sic] and then." Shaw himself asserted that he was not involved with C&S's SSA section, but instead worked in its automobile accident section. Indeed, if Escobedo, not Shaw, was Heinsohn's supervisor it might have been improper for Shaw to terminate her for following Escobedo's instructions.[60]

In addition to Shaw's deposition, C&S produced a number of documents, including files from its case management system. These notes, which are largely contemporaneous with Heinsohn's activity, are not themselves evidence of the reason C&S terminated Heinsohn.[61] According to Shaw, they are evidence that Heinsohn violated C&S's policies. But a genuine issue of

---

[59] *See Thrash v. Miami Univ.,* 549 F. App'x 511, 522 (6th Cir. 2014) ("In cases where intermediate supervisors harbor an impermissible bias, 'it is proper to impute their discriminatory attitudes to the formal decisionmaker' even if the formal decisionmaker did not harbor such attitudes." (quoting *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 477 (5th Cir. 2005)).

[60] *Haire v. Bd. of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 365 (5th Cir. 2013) (noting that when an employee has "complied with her superior's directives" a genuine issue of material fact exists as to whether the employee has "committed any official wrongdoing").

[61] In the record, the typewritten notes from the case management system also contain some brief handwritten notes. Carvajal made those handwritten notes during a meeting with Rendon. Carvajal made clear that those handwritten notes reflected what Rendon had relayed to her, not what she had discovered herself.

material fact does exist as to whether the notes in the case management system were authentic. C&S has produced evidence that, if uncontested, is sufficient to prove that the files are authentic and, therefore, admissible.[62] But, "the authenticity of a document is a question of fact,"[63] and Heinsohn testified that the notes are not authentic. She asserts in her deposition that the files in the case management system have been tampered with. [64] She also contends that anyone at C&S could have done this, because the case management system did not contain any controls.

If the testimony of a witness with knowledge "that an item is what it is claimed to be" is evidence of authenticity,[65] then the testimony of a witness with knowledge that an item is *not* what it is claimed must be evidence of its lack of authenticity. The uncontested evidence indicates that Heinsohn was primarily responsible for creating, updating, and reviewing the relevant notes in the case management system. Her deposition therefore creates a genuine issue of material fact as to whether the notes in question are authentic.

Neither is it entirely clear whether the notes in the case management system, even if authentic, constitute evidence of what Heinsohn did or did not

---

[62] FED. R. EVID. 803(6). Records of regularly conducted activity are hearsay unless, among other things, "the record was made at or near the time by . . . someone with knowledge" and "making the record was a regular practice of that activity," and that "these conditions are shown by the testimony of the custodian or another qualified witness" and that "the opponent does not show [*read*: produce evidence] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.*

[63] *Hill v. City of Houston*, 235 F.3d 1339 (5th Cir. 2000) ("[T]he ultimate determination of whether to believe the evidence is left for the fact-finder to decide."); *United States v. Sparks*, 2 F.3d 574, 582 (5th Cir. 1993) ("[T]he jury has the ultimate responsibility for deciding the authenticity issue.").

[64] A declaration by Heinsohn and Leonard, which summarized a meeting between them, Escobedo, and Rendon six months prior to Heinsohn's termination, reveals that Heinsohn believed the files were being tampered with.

[65] FED. R. EVID. 901(b).

do. This is because it is not clear exactly what C&S required her to record in those notes. The uncontested evidence indicates that Heinsohn did not receive any training on C&S's policies. In her deposition, Heinsohn declared that she had no experience in SSA cases before she came to C&S. She also explained:

> Well, it was a lot of learning while on the job. There were no—pretty much, no procedures and pol— in in place, no polic[ies] in place, no written policy or procedure in place at that time. The training that I did receive was very limited, and it was a two-hour, three-hour summary given by Maria Carbajal and that's it.

Heinsohn averred that, if she had questions, she would ask Escobedo or Carvajal. When asked how long it had taken her to feel "comfortable or that [she] had an appropriate understanding of—on what was required," she replied: "I always had questions. I always felt that the training was very limited. As a matter of fact, [Rendon] and I, we often had questions about [things] that [Carvajal] did—knew nothing about, so we had to literally call the [SSA]."[66]

The uncontested evidence further reflects that Escobedo and Carvajal did not closely supervise Heinsohn or Rendon. Heinsohn declared that the SSA cases proceeded almost entirely without Escobedo: "Many times we did win cases without [Escobedo] even touching a file." Escobedo contended that he did, in fact, review Heinsohn's and Rendon's notes on occasion to ensure that "we don't miss any deadlines." Yet, Carvajal, who conducted those reviews, stated that there was not a set "amount of months or weeks" between reviews. Instead, she said that it "depend[ed] on how busy I am," but that the reviews occurred about every six months.

---

[66] In fact, Heinsohn herself arranged for a representative of the SSA to come to C&S to conduct training for her, Rendon, and Carvajal. The training lasted two or three hours.

No. 15-50300

C&S has not produced evidence of any written policy dictating exactly what Heinsohn was required to include in her notes in the case management system; only evidence that Escobedo and Carvajal orally instructed Heinsohn to maintain such notes. C&S adduced evidence that Heinsohn did, in fact, maintain notes. Yet, because there is no uncontested evidence of any policy, it is not clear whether the notes Heinsohn maintained in the case management system should amount to exhaustive evidence of what Heinsohn did or did not do. For instance, it is not clear that C&S required Heinsohn to record every telephone call she placed to or received from a client or to the SSA. To the contrary, there is undisputed evidence that Heinsohn did not record every such call, indicating that the notes were incomplete.

Assuming, however, that the notes in the case management system were authentic and complete, there is also a genuine issue of material fact as to whether they indicate that Heinsohn violated C&S's policies. These notes provide the only evidence of C&S's legitimate, nondiscriminatory reason for terminating Heinsohn.[67] As earlier observed, Shaw insisted that C&S terminated Heinsohn because, according to these notes, she had failed to meet deadlines and then "tried to hide the ball and hope that no one would discover it." This might be a legitimate, nondiscriminatory reason for terminating Heinsohn *if* she did, in fact, fail to meet deadlines and *if* she did, in fact, attempt to conceal that failure. We consider each in turn. But those facts are genuinely contested.

*A.*   FAILURE TO MEET DEADLINES

In his deposition, Shaw stated: "[I]t is *my* policy with all the employees under me, as well as the attorneys under me, if—if there's . . . a missed deadline

---

[67] C&S, for example, largely did not provide its correspondence to or from the SSA.

No. 15-50300

. . . on a client's file, then they need to come in to see *me* immediately. Then I would expect that to occur. If it didn't occur, I'd want to know why." C&S, however, has not produced any evidence that it had such a policy in place. Even if this was Shaw's *own* practice "with all the employees under me," it is not clear whether Heinsohn was an employee "under" him, or—if she was— whether he made her aware of the policy. Although Shaw stated that he was Heinsohn's supervisor,[68] he has also indicated elsewhere that he was not.[69] In so doing, he calls the credibility of his own testimony into dispute.

In their own depositions, affidavits, and declarations, Escobedo, Carvajal, Rendon, and Heinsohn[70] state that Escobedo and Caravjal, not Shaw, were Heinsohn's supervisors. Escobedo was the supervising lawyer, and Carvajal was the supervising legal assistant. Again, Heinsohn stated that she never had any interaction with Shaw because he worked in a different section.[71] This, too, creates a genuine issue of material fact.

But, even if Shaw's policy applied to Heinsohn and even if he had made her aware of it, there is no evidence that Heinsohn violated it. Shaw clarified

---

[68] Shaw stated that he was the direct supervisor of *all* the employees at the firm.

[69] Shaw testified: "It would be my perception that it would be [Escobedo"s] job to monitor—intake the information as to if errors are occurring if someone needs to be disciplined and bring it to my attention or [Leonard]'s attention saying, Here is the specific issues. Okay?" But: "[I]f it's something that he thinks he can correct, for example, daily Needle—Needles documentation, if he thinks that he can correct that,  would probably defer to him in his discussions. He should be having discussions with his employees—not his employees. Let me rephrase that. The individual that he's supervising. [Heinsohn] is my employee."

[70] Heinsohn repeatedly maintained that her supervisors were Escobedo and Carvajal. She also said that Escobedo was Carvajal's supervisor. Heinsohn testified that she would request time off from Escobedo and Leonard, but that she would let Carvajal know.

[71] She also stated: "I didn't really work with [Shaw]. But [from] what I knew about him as far as the way he tried to treat *his* employees [I did like him]."

that, if C&S had not received notice of the event triggering the deadline, "yes, a deadline would have been technically missed," but also that the employee would not be responsible for failing to meet that deadline. This appears to be consistent with Escobedo's policy as well. When asked whether, as her supervisor, he would hold Heinsohn responsible for missing a deadline if she was not copied on a letter notifying C&S of the event triggering that deadline, he replied: "No. It's not her fault." Rendon confirmed this in her deposition.[72] Stated differently, a deadline would have been missed but not *by the employee*.

Significantly, the notes from the case management system indicate that although deadlines were missed, those deadlines were not missed *by Heinsohn*. In both cases, Heinsohn's notes indicate that the SSA did not copy her on the notice of the event triggering the deadline.[73] Assuming, as we must, that C&S was not copied on the notices, the deadlines were not missed *by Heinsohn*. This is consistent with Heinsohn's deposition, in which she stated that the notes "would show *somebody* missing a deadline" but that, "[t]o my knowledge, *I* never missed a deadline and I stand by that."

Shaw said that he terminated Heinsohn because the notes in the case management system indicated that a deadline was missed *by her*. But, to the contrary, the uncontested evidence indicates that the deadline was not missed by Heinsohn, so she did not violate C&S's policy.

---

[72] In her deposition, Rendon was asked: "Even though Heinsohn didn't know about it, she still would have been responsible for the deadline?" She responded: "No." She was also asked: "Would Maria Carvajal or George Escobedo hold you responsible for a deadline if you didn't know the deadline existed or if the letter hadn't been sent out yet?" She responded, in part: "I would have to say no, they wouldn't hold us accountable . . . ."Later on, Rendon remarked: "[If Heinsohn] wasn't cc'd [on the notice of an event triggering a deadline], you can only assume she didn't miss the deadline."

[73] C&S, which adduced the notes themselves, did not adduce any evidence refuting or contesting those notes.

No. 15-50300

*B.*    FAILURE TO FOLLOW UP

Shaw declared that he "would expect any of *my* employees, if they've been told by a client that an event [triggering a deadline] has occurred, that they [would] at least react on that event or come to an attorney and ask them how to react on that event."[74] (It is not entirely clear whether, in this instance, "expect" means "require" or merely "assume.")  Rendon likewise stated that, although Escobedo and Carvajal "wouldn't hold us accountable" for a deadline if she or Heinsohn were not aware of it, they would "if they knew that we hadn't called the client and hadn't followed up."

The notes that Heinsohn maintained in the case management system indicate when and how she became aware of each of the deadlines that was missed. The notes in the cases facially indicate that the SSA did not provide C&S with notice of the event triggering the deadline, as it was required to do.[75] The notes also indicate that C&S received notice in each after the deadline had already been missed, and that Heinsohn responded immediately by preparing and sending a good-cause letter to the SSA.[76] In addition, the notes Heinsohn

---

[74] Therefore, "if a client says, oh, I received a document on the denial, you wouldn't blow it off. You would definitely follow up on it immediately and walk into the attorney's office immediately."

[75] The SSA regulations provide: "You may appoint someone to represent you in any of your dealings with us." 20 C.F.R. § 404.1700; 20 C.F.R. § 416.1500. "*We shall send your representative . . . [n]otice and a copy of any administrative action, determination, or decision . . . .*" 20 C.F.R. § 404.1715(a) (emphasis added); *see* 20 C.F.R. § 416.1515(a). "A representative must not . . . [t]hrough his or her own actions or omissions, unreasonably delay or cause to be delayed, without good cause . . . ." 20 C.F.R. § 404.1740(c); 20 C.F.R. § 416.1540(c). "If you want us to extend the deadline to request administrative or judicial review, you must establish that there is good cause for missing the deadline." 20 C.F.R. § 405.20(a); *see* 20 C.F.R. § 404.911(b); 20 C.F.R.§416.411(b). "Examples of circumstances that, if documented, may establish good cause include, but are not limited to, the following:  . . . You did not receive notice of the determination or decision . . . ." 20 C.F.R. § 405.20(b); *see* 20 C.F.R. § 404.911(b); 20 C.F.R.§ 416.411(b).

[76] In the first case, the client received notice of the event triggering the deadline. The client contacted Heinsohn, who requested that the client transmit the notice by fax to her.

maintained indicate that she made contact with each client and with the SSA before and after the event triggering the deadline. Likewise, the evidence does not suggest that these notes were, in fact, an exhaustive and complete record of those interactions. For example, some notes required that the reader see the "file" with questions, and Heinsohn herself indicated that she kept separate notes.[77] There is a genuine issue of material fact whether Heinsohn violated C&S's policy by failing to follow up adequately with a client or with the SSA.

*C.*    FAILURE TO DISCLOSE UNMET DEADLINES

The uncontested evidence indicates that, rather than "hiding the ball," Heinsohn contemporaneously recorded the circumstances of each of the missed deadlines in her notes in the case management system. All of these notes—which provide the sole basis for C&S's proffered legitimate, nondiscriminatory reason for firing her—were accessible to Escobedo and Carvajal from the moment they were created. Escobedo himself stated that they reviewed the notes, in part to ensure that "we don't miss any deadlines."  Escobedo also said: "*My* function is mainly to making—make these cases—or the case management of these cases, make them go forward, make sure we don't miss deadlines, things like that." The only evidence of missed deadlines that C&S has produced are Heinsohn's own notes, which were entered contemporaneously with her learning of the missed deadlines. Those notes were available to Escobedo and Carvajal at all times. Again, C&S has not produced evidence that, in addition to informing Escobedo of the missed deadlines by maintaining the notes in the

The client failed to do so. Eventually, Heinsohn received notice from the SSA directly, at which point the deadline had been missed. It is not clear, however, whether Heinsohn had any other contact with the client or the SSA in addition to that recorded in the notes.

[77] Heinsohn said: "You wrote [notes] down just in case the system went down, just in case, for whatever reason , the system was—the program was manipulated with, you had your own record and you could make sure that you kept on track of what was going on."

case management system, Heinsohn was also required to inform him of the missed deadlines through other means.

## D.     SENDING GOOD-CAUSE LETTERS

The uncontested evidence demonstrates that Escobedo permitted Heinsohn to function somewhat autonomously. She stated: "Many times we did win cases without [Escobedo] even touching a file." In fact, it appears that Escobedo permitted Heinsohn to prepare and sign good-cause letters on his behalf.  When asked whether Escobedo authorized Heinsohn to prepare and send good-cause letters on his behalf, Shaw replied: "You'd have to ask him that question." Shaw also said: "I would expect [Escobedo] to be involved in the decision[-]making of sending out a good[-]cause letter." He did not say that he or C&S had actually required this of Escobedo. Shaw remarked that he asked Escobedo if he had signed the good-cause letters in the cases, and "[Escobedo] said he was unaware of the entire situation until it was brought to his attention." This, however, is hearsay. And even if it were not, it does not resolve whether Escobedo had provided Heinsohn with general authorization to prepare and send good-cause letters on his behalf. [78] Shaw stated: "I don't know if . . . there was any supervision or oversight or approval on those letters . . . ."

In fact, Escobedo himself said that, although "[Heinsohn] wrote a good-cause letter to the [SSA] saying that we never got notice" on his behalf and although he was unaware of the entire situation, Escobedo conceded that her doing so "wasn't necessarily my problem with it." The uncontested evidence indicates that Heinsohn was not required to obtain Escobedo's authorization before sending good-cause letters.

---

[78] It goes without saying that, when considering evidence in the light most favorable to Heinsohn, we consider only that evidence in the record itself.

No. 15-50300

*E.* FAILURE TO COMPLETE TASKS

Before beginning her maternity leave, Heinsohn met with Escobedo and Rendon—but not with Carvajal—to review her pending cases. According to Escobedo: "[P]rior to her leaving, I asked [Heinsohn], Please, Cynthia in fairness to—to [Rendon] and everyone else here that's [*sic*] going to take on your cases, please make sure all the appeals are filed and calls are returned, and, you know, things that are done—that need to be done get done before you leave, and she promised me that they had been done."[79] Heinsohn, however, recalled it differently. She said that Escobedo had merely instructed her to "[j]ust make sure that [Rendon] was up to speed on everything." When asked whether there was anything else Escobedo had instructed her to do, she replied: "Not that I recall, no." As a preliminary matter, there is a genuine issue of material fact about what Heinsohn was required to do before she left on maternity leave.[80]

Even so, the notes themselves reflect that, before leaving, Heinsohn completed all outstanding work in her pending cases. Although Heinsohn was aware that two deadlines had been missed because of the SSA's failure to provide C&S notice of the events triggering those deadlines, Heinsohn prepared and sent good-cause letters to the SSA for both. Until the SSA ruled on those good-cause letters, there was nothing further for her to do.[81] The notes

---

[79] In his declaration, Escobedo stated: "I had specifically asked [Heinsohn] to make sure there were no pending deadlines, appeals, or pending issues with any of her clients. She said she would take care of these matters."

[80] C&S seems to suggest that Heinsohn had some obligation, before leaving, to complete all of the work that she would have done had she not left. For instance, it asserts that she should have prepared and filed the appeals that would become due during her absence.

[81] The evidence indicates that the SSA eventually granted relief in response to both good-cause letters.

also plainly indicate that Heinsohn had updated the clients on the status of their cases, including that deadlines were missed and good-cause letters sent.

Escobedo, Carvajal, and Rendon all had access to Heinsohn's notes in the case management system, so they were at least constructively aware of the status of each of her cases, including any missed deadlines and good-cause letters. And, *before* Heinsohn left, Rendon actually knew the status of each case, including the missed deadlines and good-cause letters.

Rendon became aware of the missed deadline and good-cause letter in one of the two relevant cases while Heinsohn was transferring the cases to her.[82] Rendon stated that, even though the notes for that case indicated a missed deadline, the deadline was not missed *by Heinsohn*, assuming the notes were accurate. Rendon said that the notes indicated that Heinsohn had not been copied on the notice of the event triggering the deadline and, "[i]f [Heinsohn] wasn't cc'd, you can only assume she didn't miss the deadline."

Rendon learned of the missed deadline in the other relevant case on Heinsohn's last day. Rendon said that she answered a telephone call from the SSA regarding the good-cause letter Heinsohn had sent on several days earlier.[83] In her deposition, Rendon declared that "I went ahead and let [Heinsohn] know." She also entered a note in the case management system indicating the same. (After Rendon "let her know" about the call, Heinsohn entered another note in the system clarifying the status of the case.) Notably, Rendon said in her deposition that, when she took that call and entered the

---

[82] She was asked whether she became aware of the missed deadline when "[Heinsohn] handed off the cases to you . . . that you were going through the files?" To which she answered: "Yes, I think that's when it was."

[83] In her declaration, Rendon stated: "Before [Heinsohn], left I was taking all the calls and new intakes . . . ."

note, it was not even Heinsohn's case anymore; she said "[i]t was my case." Rendon said that, even after becoming aware of this missed deadline in her own case, she did not need to make Escobedo aware of it: "I did not mention it until . . . Escobedo received the letter that [Heinsohn's] good[-]cause [letter] was approved." Rendon acknowledged that, despite all this, she never asked Heinsohn for clarification about the two cases, either before or after she left.

At this summary judgment stage of the proceedings, the uncontested evidence makes clear that Heinsohn acted consistently with Escobedo's instructions. Her alleged failure to adhere to those instructions could not have provided a legitimate reason for firing her.

In sum, there are genuine issues of material fact that preclude summary judgment. To determine whether C&S's nondiscriminatory reason for terminating Heinsohn was legitimate or pretextual, a finder of fact must weigh the evidence. At bottom, the magistrate judge and district court erred in rejecting Heinsohn's statements as self-serving and accepting Shaw's, Escobedo's, Caravajal's, and Rendon's. Such an "approach is inconsistent with fundamental rules governing summary judgment."[84] "By choosing which testimony to credit and which to discard, '[a] court improperly 'weigh[s] the evidence' and resolve[s] disputed issues in favor of the moving party.'"[85] Doing so is tantamount to making a credibility determination, and—at this summary judgment stage—a court "may make no credibility determinations."[86] Instead, a court "must disregard all evidence favorable to the moving party that the

---

[84] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015).

[85] *Id*. (quoting *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014)).

[86] *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 407–408 (5th Cir. 2011) (citing *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 229 (5th Cir. 2010)); *see Whiteside v. Gill*, 580 F.2d 134, 139 (5th Cir. 1978) ("This case boils down to a credibility choice. We cannot make that choice on the record before us.").

No. 15-50300

[finder of fact] is not *required* to believe."[87] Although a court "is not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence,"[88] a nonmovant's statement may not be rejected merely because it is not supported by the movant's or its representatives' divergent statements.

Simply put, Heinsohn's statements are no more and no less self-serving than those of the others. If we toss Heinsohn's deposition, we must also toss the depositions, affidavits, and declarations of the others for the same reason. To hold otherwise would signal that an employee's account could never prevail over an employer's. This would render an employee's protections against discrimination meaningless.

When, as here, a motion for summary judgment is premised almost entirely on the basis of depositions, declarations, and affidavits, a court must resist the urge to resolve the dispute—especially when, as here, it does not even have the complete depositions. Instead, the finder of fact should resolve the dispute at trial.

### III.
#### CONCLUSION

For the forgoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion. We express no view on how the finder of fact should resolve this dispute on remand. We decide this appeal only on the basis of the record before us at this relatively early stage.

---

[87] *Chambers*, 428 F. App'x at 407–408 (emphasis added).

[88] *Id.*