# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2024

Lyle W. Cayce
Clerk

No. 23-20282

WESTPORT INSURANCE CORPORATION, *On Its Own Behalf* and ASSIGNEE OF HOUSTOUN, WOODWARD, EASON, GENTLE, TOMFORDE and ANDERSON, INCORPORATED, *doing business as* INSURANCE ALLIANCE,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, *doing business as* PENN NATIONAL INSURANCE,

*Defendant—Appellee/Cross-Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-1947

---

Before HIGGINBOTHAM, STEWART, and HIGGINSON, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

This is a dispute between a primary insurer, Appellant Westport Insurance Corporation ("Westport"), and an excess insurer, Appellee Pennsylvania National Mutual Casualty Insurance Company ("Penn National"). This case concerns liability for a judgment against their mutual insured: Insurance Alliance ("IA"), an insurance agency. In 2008, Lake Texoma Highport LLC ("Highport") sued IA for failing to procure the

requested insurance coverage to protect its marina, which was damaged during heavy rainfall destroying much of Highport's property. IA had a primary insurance policy with Westport and a policy that provided excess coverage with Penn National. As the primary insurer, Westport controlled the defense in the Highport suit. Throughout the underlying litigation, Highport and Westport engaged in multiple settlement discussions, spanning from 2009 through 2010, in which Westport rejected five settlement demands offered. In 2012, a jury found IA liable for breach of contract in failing to procure the requested insurance coverage for Highport's marina.

Nearly four years later, Westport and Penn National each sued the other in IA's name as its subrogee, seeking to recover the portion of the excess judgment it paid on the insured's behalf. Westport sued Penn National for breach of the excess insurance policy. Penn National countersued Westport for violating its *Stowers*[1] duty to accept one of the five settlement offers within the primary insurance policy limits. At summary judgment, the district court determined that Penn National breached its duties to defend and to indemnify. After a five-day jury trial, a jury found that Westport failed to act as an ordinarily prudent insurance company when it did not accept any of Highport's settlement demands.

We agree that Penn National breached its duties under the excess insurance policy. We also agree that Westport's *Stowers* duty was triggered by Highport's offers and that Westport violated this duty. The district court's judgment is AFFIRMED.

---

[1] *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929) [hereinafter *Stowers*].

No. 23-20282

# I.

*A. Factual Background: The Highport Suit*[2]

In 2007, Highport retained IA to procure blanket insurance for its marina located in North Texas on Lake Texoma. IA engaged CRC Insurance Services ("CRC"), an insurance intermediary, which in turn used its affiliate, Bowood, to obtain a policy for Highport from Lloyd's of London. However, the policy obtained from Lloyd's did not provide blanket coverage. After suffering extensive flood damage to its marina in 2007, Highport discovered that it did not have the blanket coverage as it had requested. This gave rise to disputes among Highport, IA, CRC, Bowood, and Lloyd's over responsibility for Highport's losses. On April 4, 2008, Highport filed a lawsuit against IA and Lloyd's in Texas state court for their failure to provide the requested coverage.

IA was also insured. IA purchased a primary Insurance Industry Professional Liability Policy from Westport ("Westport Policy") with a coverage period of June 1, 2007 to June 1, 2008. IA purchased an Agent's Umbrella Liability Policy ("Penn National Policy") that provided excess coverage for various underlying insurance policies, including the Westport Policy from Penn National, with a coverage period of June 1, 2007 to June 1, 2008. The Westport Policy had a $5 million limit of liability per claim, and the Penn National Policy carried a $15 million limit total. The Westport Policy also required Westport to assume IA's defense in cases such as the underlying Highport litigation. Throughout the underlying litigation, Highport and Westport engaged in multiple settlement discussions in which

---

[2] Over the span of fifty-one pages, the magistrate judge "recounts, in painful detail, the loss that gave rise to IA's claim, the course of litigation, the communications among IA, Westport, Penn National, the underlying plaintiff, and others, and their actions." We highlight the most relevant events here.

Westport rejected all five settlement demands offered in May 2009, September 2009, May 2010, July 2010, and November 2010. A jury ultimately found IA liable for breach of contract in failing to procure the requested insurance coverage for Highport's marina and awarded Highport nearly $13.7 million.

On February 5, 2009, IA filed a third-party complaint against CRC and Bowood in the Eastern District of Texas. On February 23, 2009, CRC wrote IA to proclaim that should IA refuse to promptly withdraw the February 5, 2009 demand letter and dismiss its third-party complaint against CRC, CRC would treat such refusal as a continuing breach of IA's obligations to CRC under the Brokerage Agreement "to indemnify and hold CRC harmless from any claim asserted against CRC in following the instructions of the" insured. Moreover, CRC intended the letter to constitute "notice and demand under the Brokerage Agreement that [IA] indemnify CRC, and hold CRC harmless from and against any and all claims which have been or may be asserted against CRC in respect of the insurance policy and transaction made the basis of this captioned lawsuit." On March 3, 2009, Rick Oldenettel, IA's trial attorney, wrote a letter to James Redeker, Westport's claim handler and corporate representative, regarding the CRC indemnity claim. In the letter, Oldenettel confessed that counsel had "determined [the third-party complaint] was necessary, because at this point in time, [IA was] not sure whether the error interjected in the policy between CRC and Southern Cross,[3] or between Southern Cross and Bowood, or Bowood and the underwriters in London." He continued that "[IA does] not

---

[3] Third-party Defendant CRC Insurance Services Inc.—acting individually and/or through its agent/affiliated entity/division Southern Cross Underwriters (a/k/a Southern Cross Underwriters, Inc.) and d/b/a CRC of Texas, Inc. and/or CRC Insurance Services of Texas, Inc. (hereafter collectively referred to as "CRC")—is an Alabama corporation doing business in Texas.

believe the indemnity paragraph to be applicable under the facts of this case, and with [Westport's] permission will politely decline [the] same." That same day, Oldenettel responded to CRC stating that "[IA] rejects, in total, all of [CRC's] demands, allegations and contentions contained in [the] letter of February 23, 2009. The notice letter and the Third-Party Petition will not be withdrawn, and [IA] intend[s] to proceed with [its] claims as stated." In response to IA's third-party complaint against CRC and Bowood, Highport filed a second amended complaint asserting claims against CRC and Bowood as third-party defendants on April 3, 2009.

On May 15, 2009—five days before the scheduled mediation and slightly more than one year after the filing of the Highport lawsuit—Oldenettel drafted a letter to Westport and IA stating that, although an initial exchange of documents by some of the parties had occurred, his opinion was that the mediation was "extremely premature" because no discovery had taken place. In the May 15, 2009 pre-mediation analysis letter to Redeker and Westport, Oldenettel again proclaimed that "[w]e do not believe the indemnity paragraph to be applicable under the facts of this case" and further acknowledged that CRC "raised the spectre [sic] of Arbitration per the contract with [IA]."

On May 20, 2009, IA, CRC, Bowood, and Highport attended their first mediation. Westport did not attend. Highport delivered a written offer to IA at the mediation for $2 million with Highport's "full & complete release of any and all claims arising out of the placement of coverage at issue in the pending suit." The offer was intended to comply with the *Stowers* doctrine but expired at 11:30 p.m., forty-five minutes after it was made. Neither IA nor Westport made a counteroffer in response to the $2 million demand before the window expired. At midnight on May 20, 2009, Lloyd's reached a settlement agreement with Highport for $5.25 million. On May 21, 2009, Oldenettel sent Redeker a post-mediation analysis letter. In the letter,

he explained that "[the May 20, 2009] *Stower*'s letter [was] premature as there ha[d] not been an adequate opportunity to obtain discovery and evaluate the merits of everyone's respective positions. Furthermore, a forty-five-minute window of opportunity on a *Stower*'s letter is laughable."

On September 22, 2009, Highport sent IA a *Stowers* demand for settlement in the amount of $2.2 million in exchange for a release of any and all claims against IA related to the Highport litigation. The offer stated that it would remain open for fifteen days. Westport rejected the demand. While Westport controlled IA's defense, Penn National was not notified of the suit until 2010, "about two years after the Highport litigation began." On March 15, 2010, Penn National sent a letter to Westport "demanding [it] resolve this case within [its policy] limits immediately."

On May 12, 2010, six days ahead of a second mediation, Highport drafted a letter to IA offering to release any and all of Highport's claims against IA in exchange for $4.9 million. The letter was self-identified as a *Stowers* demand. On May 18, 2010, a second mediation was held. At mediation, Highport demanded $5.9 million but IA, CRC, and Bowood countered with a joint offer of $2.1 million. The second mediation was ultimately unsuccessful. In a letter dated May 24, 2010, Penn National wrote Westport about the $4.9 million *Stowers* demand. Penn National requested "Westport settle these cases at its own expense. In the Highport matter, Westport should resolve this case either for the $4.9 million demanded in Highport's May 13, 2010 letter or in any agreement for [a] lesser amount that [it] may negotiate."

On July 7, 2010, IA, CRC, and Bowood proposed a collective $1.8 million settlement to Highport with IA contributing $1.1 million and CRC and Bowood's contributing a total of $700,000. On July 24, 2010, Highport proposed a counteroffer of $3.6 million ("July 2010 counteroffer"),

indicating that it was the least Highport would accept, but IA and Westport rejected it. The next settlement action was at the end of October 2010 when the defendants agreed to increase the combined offer to $2.1 million. Highport declined the offer, notifying IA that it was "sticking with [its] $3.6 million demand," ("November 2010 counteroffer"). According to IA, Westport always maintained that the Highport action could be resolved for far less than its policy limits and that it was unwilling to tender these policy limits. On September 13, 2010, CRC filed a third-party demand against IA for breach of the Brokerage Agreement in an arbitration proceeding before the American Arbitration Association.

In November 2011, in advance of a court-ordered third mediation, Highport floated a demand of $25 million with IA's portion at almost $15 million. Redeker characterized the demand as "ridiculous given the facts of this case." At the mediation on November 9, 2011, Highport started with the $25 million demand and lowered it to $23 million, which received no offers and effectively ended the mediation. In a letter dated February 10, 2012, IA's counsel attested that Westport had passed on several opportunities to settle within its policy limits based on its belief that a lower settlement could be reached. IA urged Westport to resolve the case as promptly as possible because "it seem[ed] to be clear that [IA was] exposed to a jury verdict and ultimately a judgment in a much larger amount."

After several rounds of failed settlement offers, the Highport trial began on April 17, 2012, and the jury ultimately found in favor of Highport. On June 20, 2012, the state trial court entered a final judgment against IA and awarded damages in the amount of $8,738,598, representing the jury's determination of the amount of property and business-interruption coverage that would have been provided by the requested policy less the amount available under the policy obtained. The court also awarded interest, court

costs, and attorneys' fees—totaling $13.7 million against IA. Westport appealed.

To prevent the seizure of IA's assets during the appellate process, a supersedeas bond was needed. IA contended that Westport was obligated to procure a bond sufficient to cover the entire judgment. In a letter dated July 24, 2012, IA asserted that it was "crystal clear" that it was "Westport's obligation to procure a bond sufficient to supersede the entire judgment" and then to seek reimbursement for any premium "attributable to any portion of the judgment which exceed[ed] Westport's liability." IA opined that it was "unlikely that anyone other than Westport ha[d] responsibility for payment of the judgment" due to Westport's repeated rejections of offers to settle within the Westport Policy limits. During this time, Highport filed a petition for a writ of garnishment to seize IA's assets. Westport requested Penn National to bond the portion of the judgment above Westport's limits. Penn National refused. Penn National's response echoed IA's interpretation of Westport's duty to procure a bond for the entire amount of the judgment.

During this period of deliberation, IA as principal and Liberty Mutual Insurance Company as surety obtained a supersedeas bond in favor of Highport in the amount of $11,257,861 on August 7, 2012, so as to avoid the seizure of IA's assets. Afterwards, IA requested that both Westport and Penn National reimburse it for the bond. Westport responded to IA that it was "willing to withdraw its argument on the bond, to reimburse IA for the bond premium and substitute itself or one of its affiliated entities as the principal." Westport further requested "that, in the event the [] judgment is upheld on appeal, Westport and Penn National agree that Westport will pay to Highport the remainder of its policy limits . . . and Penn National will fund the rest." With that information, IA inquired with Penn National about whether it would pay the remainder of the judgment if Westport's policy was exhausted after an appeal. Penn National responded that "[it] will continue to honor its

obligations to [IA] under the Penn National policy." On December 17, 2012, IA as principal and North American Specialty Insurance Company ("NASIC") as surety obtained a substitute supersedeas bond in favor of Highport in the same amount. The court accepted the bond, and it was filed. Westport agreed to indemnify NASIC for amounts in excess of Westport's policy limits. According to Redeker, Westport posted the supersedeas bond for the entire amount of the judgment, rather than in the amount of its remaining aggregate limit, on assurances from Penn National to IA.

On November 18, 2014, the Texas Court of Appeals affirmed the state trial court's judgment. *See Ins. All. v. Lake Texoma Highport, LLC*, 452 S.W.3d 57 (Tex. App.—Dallas 2014 [5th Dist.], pet. denied). On January 15, 2016, the Supreme Court of Texas denied rehearing. On January 20, 2016, the Texas Court of Appeals issued a mandate affirming the state trial court's judgment. On January 21, 2016, Highport demanded that IA pay the full amount of the judgment or face collection.

On January 28, 2016, IA, Westport, and NASIC entered into a memorandum of understanding ("MOU") with Highport that required NASIC to pay Highport the amount of the judgment not disputed ($9,936,492.65) and to deposit the bond's balance ($1,321,368.35) into the state court's registry until all remaining issues were resolved. Penn National declined to participate in the MOU negotiations. On February 17, 2016, Westport then reimbursed NASIC for the undisputed amount ($9,936,492.65). On June 6, 2016, the state trial court determined the balance due to Highport to be $1,697,820.48, as of May 31, 2016, and released the funds ($1,321,368.35) in the court registry to Highport. Westport reimbursed NASIC for the amount released from the court registry. On June 13, 2016, Penn National paid the remaining amount of that balance ($379,885.78) to Highport.

No. 23-20282

*B. Procedural History*

On March 24, 2016,[4] Westport brought this suit in IA's name, as its subrogee, to recover for Penn National's breach of the excess insurance policy, and Penn National counterclaimed in IA's name, as its subrogee, under the *Stowers* doctrine. Westport sued Penn National for breach of the excess insurance policy and to cover its contribution of the jury award against IA. It argued that it had to pay $7.7 million over its $5 million policy limits to prevent enforcement of the excess judgment against IA because Penn National deflected its obligation to pay under its $15 million excess insurance policy after exhaustion of the primary policy. Penn National pleaded that Westport breached its *Stowers* duty by failing to accept the five settlement demands from Highport.

Before trial, Westport and Penn National filed competing motions for summary judgment. The district court referred the matter to the magistrate judge, who adjudicated the parties' competing motions and made recommendations in an eighty-four-page Memorandum and Recommendation. In a brief opinion, the district court adopted the magistrate judge's recommendations in full. The district court granted in part and denied in part Westport's *Stowers* and breach-of-contract motions and granted Penn National's motion for partial summary judgment on Westport's claims for breach of contract and promissory estoppel.

---

[4] Westport filed this insurance action in the Middle District of Pennsylvania against Penn National. On July 1, 2016, the Middle District of Pennsylvania granted Penn National's motion to transfer the venue and transferred the case to the Southern District of Texas. After the case was transferred, the parties underwent months of filing amended pleadings and stipulations—omitting claims, supplementing allegations, and adding requests for declaratory judgment. In January 2018, after a period of discovery, the parties each filed motions targeting the other's expert testimony, as well as pending dispositive motions. On April 18, 2018, the parties unsuccessfully attempted mediation.

In its *Stowers* motion, Westport argued that, as a matter of law, four of Highport's settlement offers did not trigger its *Stowers* duty to settle: (1) the first challenged offer was the self-described $2 million *Stowers* demand presented at the end of the first mediation in May 2009; (2) the second challenged offer was the self-described $4.9 million *Stowers* demand presented in advance of the second mediation in May 2010; and (3) the third and (4) fourth challenged offers were the $3.6 million counteroffers orally presented in July 2010 and November 2010 as collective offers to IA, CRC, and Bowood.[5] Granting in part Westport's *Stowers* motion, the district court determined that "the May 2010 $4.9 million demand was not within the Westport Policy aggregate limit" and "as a matter of law, Westport's *Stowers* duty was not triggered at that time." Denying in part Westport's *Stowers* motion, the court determined that the "circumstances of the May 2009 $2 million demand are such that a reasonable jury could find that an ordinarily prudent insurer would have accepted it in light of the likelihood and degree of Westport's potential exposure to an excess judgment." Lastly, the court determined that "the course of communications and continuing settlement efforts, could allow a reasonable jury to find that the terms and conditions were clear with regard to the oral $3.6 million settlement demands of July and November 2010."

Granting in part Westport's breach-of-contract motion, the district court concluded that Penn National breached its duty to defend in February

---

[5] During trial, Westport challenged the September 2009 demand, arguing that it was not a valid *Stowers* demand because it did not fully release IA or eliminate the risk of further liability. This argument was not asserted in its summary judgment motion. At summary judgment, the court agreed that the May 2010 demand could not provide a basis for liability. After trial, the court also determined that the May 2009 demand was not a valid *Stowers* demand.

2016 and breached its duty to indemnify in June 2016.[6] The district court stated that "regarding [the] duty to defend, the Penn National Policy stated that the transfer of defense would occur when the underlying limits of insurance were 'used up' in the payment of judgments or settlements." Thus, the court determined that Penn National's duty to defend was triggered on February 17, 2016, "when [Westport] reimbursed NASIC for the payment to Highport in the amount of $9,936,492.65, an amount clearly in excess of Westport's remaining policy limits" and which exhausted the Westport Policy. As such, the court determined that "Penn National breached [its] duty [to defend] by failing to assume IA's defense" because "according to the summary judgment evidence, Penn National did nothing to assist in the transfer of defense after receiving Westport's notification of exhaustion." The district court was unpersuaded by "[a]ll of Penn National's complaints regarding what Westport did not do in order to transfer the defense." Moreover, it held that Penn National's duty to indemnify was triggered on June 6, 2016 when "Westport reimbursed NASIC $1,321,368.35 for the amount released from the court's registry. Penn National was responsible for the payment of that amount because its duty to indemnify was applicable." Although Penn National paid $379,885.78 to Highport on IA's behalf to complete the fulfillment of IA's obligation on the judgment of $1,697,820.48, the district court noted that Penn National did not pay the total amount ($1,321,368.35) released from the court's registry at that time and had not reimbursed Westport.

At a November 29, 2022 pretrial conference, Penn National averred that Westport's violation of the *Stowers* doctrine was a defense and thus Penn National was "entitled to excuse [its] performance based on the doctrine."

---

[6] The district court denied Westport's breach-of-contract motion as to Penn National's duty to indemnify *before* June 2016.

Westport contended that Texas caselaw does not support the notion that "a primary carrier's *Stowers* violation excuses an excess carrier's obligation to pay under [its] own policy. It's not a defense to [excess carriers'] obligation[s] to their insured to pay the insured's excess liability." The district court concluded that Penn National's use of the *Stowers* doctrine was proper in this sense because the court viewed the use of "defense" as a practical term rather than a legal term.

On December 5, 2022, a five-day jury trial commenced between Westport and Penn National. At the close of trial, the jury returned its verdict in favor of Penn National, finding that Westport had breached its *Stowers* duty on four separate occasions—in May 2009, September 2009, July 2010, and November 2010. The district court subsequently set aside the May 2009 demand as being unsupported by admitted evidence at trial. Still, the court entered judgment against Westport as to the September 2009, July 2010, and November 2010 demands. After the trial, Westport filed a Rule 50(b) motion for judgment as a matter of law and a Rule 59(a) motion for a new trial. The district court denied Westport's motions. Westport and Penn National appealed. We ordered that Westport's opposed motion to strike portions of Penn National's reply brief be carried with the case on February 28, 2024.

## II.

We review the denial of a motion for judgment as a matter of law "de novo, using the same analysis as the district court." *United States v. Hodge*, 933 F.3d 468, 473 (5th Cir. 2019). We reverse the district court's ruling only if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the nonmovant.]" *Id.* (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)). When a party challenges the denial of a motion for judgment as a matter of law

following a jury trial, this court is "especially deferential" to the jury's verdict. *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (citation omitted). We are "wary of upsetting jury verdicts" and "courts may grant judgments as a matter of law only if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 785 (5th Cir. 2017) (internal quotations omitted).

"The jury's findings of fact are reviewed on the whole record and are affirmed if supported by substantial evidence." *Hunnicutt v. Wright*, 986 F.2d 119, 122 (5th Cir. 1993). This court must "credit the non-moving party's evidence and disregard all evidence favorable to the moving party that the jury is not required to believe." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (cleaned up). Moreover, we must "draw[] all reasonable inferences and resolv[e] all credibility determinations in the light most favorable to the non-moving party." *Flowers*, 247 F.3d at 235 (citation omitted). We review a district court's denial of a motion for a new trial for abuse of discretion. *Fornesa v. Fifth Third Mortg. Co.*, 897 F.3d 624, 627 (5th Cir. 2018). We reverse "only when there is an absolute absence of evidence to support the jury's verdict." *Wantou v. WalMart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022) (internal quotation marks and citation omitted).

"Jury instructions are reviewed for abuse of discretion." *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 388 (5th Cir. 2017). "A district court by definition abuses its discretion when it makes an error of law." *Id*. Thus, when a challenged jury instruction hinges on a question of law, review is de novo. *GE Cap. Com., Inc. v. Worthington Nat. Bank*, 754 F.3d 297, 302 (5th Cir. 2014). This court reviews whether the district court's charge is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them. *United States v.*

*Laury*, 985 F.2d 1293, 1300 (5th Cir. 1993). However, an erroneous jury instruction is reversible only if it "affected the outcome of the case." *Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, 917 F.3d 352, 357 (5th Cir. 2019) (citation omitted).

## III.

### *A. Westport's Breach-of-Contract Claims & Penn National's Duties*

Damages resulting from Penn National's breach of its duties to indemnify and defend are at issue in this litigation. At summary judgment, the district court held that Penn National breached its duty to defend IA on February 17, 2016 and breached its duty to indemnify IA on June 6, 2016. Penn National does not appeal this determination.

Westport argues that Penn National cannot rely on the *Stowers* doctrine to relieve it of its contractual duties or as a defense to Westport's breach-of-contract claims. Penn National contends that its breaches, which occurred more than five years after Westport's breach of its *Stowers* duty, caused no damage to IA because Westport's negligence caused all of IA's damages. Further, it maintains that the district court "did not recognize *Stowers* as a breach-of-contract defense." Westport has the better argument here.

At the September 13, 2022 pretrial conference, Penn National conceded that it "owed a duty to indemnify and to defend as of [the aforementioned dates]" and that it failed to do so. However, it emphasized that its "breach of the contract [should], therefore, [be] excused" because of asserted "policy defenses." Namely, Penn National averred, at the November 29, 2022 pretrial conference, that Westport's violation of the *Stowers* doctrine was a defense and thus Penn National was "entitled to excuse [its] performance based on the doctrine." Westport contended that Texas caselaw does not support the notion that "a primary carrier's *Stowers*

violation excuses an excess carrier's obligation to pay under [its] own policy. It's not a defense to [excess carriers'] obligation[s] to their insured to pay the insured's excess liability."

In response, the district court explained that this issue "would be resolved by the jury answering the *Stowers* question" because "it [was] all going to come out in the wash." The district court reasoned that if there was a *Stowers* breach, then the damages that Westport owed Penn National for violating the doctrine would amount to the share of the excess judgment beyond the Westport policy limits less the portion of the excess judgment Westport had already paid on the insured's behalf. In the alternative, if the jury found no *Stowers* breach, then Penn National would owe Westport the portion of the judgment in excess of the Westport policy limits. The district court concluded that Penn National's use of the *Stowers* doctrine was proper in this sense because the court viewed the use of "defense" as a practical term rather than a legal term. Moreover, after trial, the district court held:

> While it is true that this [c]ourt previously found that Penn National breached its duties to defend and indemnify (Doc. No. 122 at 72, 73), these breaches occurred more than five years after the jury found that Westport violated its *Stowers* duty. A finding that Penn National subsequently breached its duties to defend and indemnify IA has no impact on this case.

We disagree. The district court erred when it made Westport's ability to recover from Penn National conditional, concluding that "[*i*]*f* the *Stowers* claim is unsuccessful, Westport would be entitled to recover from Penn National the entire amount of the judgment in excess of Westport's remaining policy limits less the amount paid by Penn National." We hold that Westport was entitled to recover the entire amount of the judgment in excess due to Penn National's breach of its duties to indemnify and defend IA under the excess insurance policy.

Put otherwise, once the district court determined that Penn National had breached the contract, it should have required Penn National to pay the excess judgment (i.e., the amount owed above Westport's remaining aggregate policy limit). Then, the court could have proceeded to trial on Penn National's *Stowers* claim and, if and when the jury found that Westport had breached its *Stowers* duty, Westport would have had to pay back the amount it had just received from Penn National.

However, to the extent that the district court erred in recognizing *Stowers* as a breach-of-contract defense, the error was harmless because this evidence of Penn National's contract breach—which occurred years after the *Stowers* breach—was never presented to the jury. "The harmless error doctrine applies to the review of evidentiary rulings." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016) (quoting *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010)). We apply a deferential abuse of discretion standard when reviewing a district court's evidentiary rulings. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018). "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Heinsohn*, 832 F.3d at 233 (quoting *Nunez*, 604 F.3d at 844. However, "even if a district court has abused its discretion, [this court] will not reverse unless the error affected 'the substantial rights of the parties.'" *Heinsohn*, 832 F.3d at 233 (quoting *Nunez*, 604 F.3d at 844); *see* Fed. R. Evid. 103. As such "[t]he party asserting the error has the burden of proving that the error was prejudicial," *Williams*, 898 F.3d at 615 (citation omitted).

At the November 29, 2022 pretrial hearing, the district court concluded that the only issues outstanding for Westport's breach-of-contract claim were damages and applicable defenses. Further, because damages were ascertainable, the district court requested that the parties stipulate to damages and have the court decide the contract defenses, along with

Westport's unclean hands defense, as a matter of law after trial, so that only the *Stowers* negligence questions would be submitted to the jury. On the first day of trial, the parties stipulated to the damage model and calculations, as reflected in Exhibit 156, and agreed to submit defenses to the court for determination after the trial. At the conclusion of the trial, the district court requested that the parties submit a joint letter outlining their views on the remaining issues to be decided, namely (1) whether Penn National acted with unclean hands; (2) whether any of Penn National's policy defenses applied; and (3) the parties' claims to recover their respective attorney's fees.

Here, the district court's error was harmless because, "after a 'thorough examination of the record,' [we are] able to 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *United States v. Cessa*, 785 F.3d 165, 186 (5th Cir. 2015) (quoting *United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011)). Practically speaking, the district court was correct to note that when the jury found that Westport had breached its *Stowers* duty, the amount above the primary insurance policy was thus the responsibility of Westport—not Penn National. After trial, the district court recognized Penn National's breach and Westport's breach and determined that "the ultimate outcome of this lawsuit will determine which company has to pay the amount of a final judgment entered against their mutual insured [IA]." As follows, the amount that Penn National already paid was now reimbursable; and no additional damages were owed to Westport.

Notably, Westport concedes that *Stowers* is a "right to reimbursement" limited "to the amount the insured has paid." *Seguros Tepeyac, S. A. v. Bostrom*, 347 F.2d 168, 178 (5th Cir. 1965). Likewise, Westport agrees that "Penn [National] stands in the shoes of IA only with respect to the tiny fraction of the excess judgment it paid—not the $7.7 million at issue in the breach-of-contract claim"—albeit to make the

argument that Penn National lacks standing to assert a *Stowers* claim. Consequently, that is why the district court's final judgment only allows for Penn National to recover damages from Westport in the sum of $379,885.78—the amount that Penn National indemnified NASIC.

Our review of the record shows that a reasonable jury could have found that Westport breached its *Stowers* duty based on the evidence presented at trial. Notwithstanding what Penn National owed because of its breach, Westport was required—due to its own breach—to reimburse Penn National for the amount that it had indemnified NASIC. The jury's considerations were void of any mention of *Stowers* as an excuse for the contractual breach because the district court had assessed Penn National's breach at summary judgment and had also decided that Penn National could not offer evidence or argument at trial that it had complied with its contractual obligations and had not breached its contract. Thus, the jury's findings were not harmfully influenced so as to affect Westport's substantial rights. *Heinsohn*, 832 F.3d at 233; *Williams*, 898 F.3d at 615. Under the facts of this case, any error was harmless because on this record the jury would have found that Westport breached its *Stowers* duty and that Penn National's payments of the share of the excess judgment were reimbursable. *See Skilling*, 638 F.3d at 482.

### B. *Penn National's* Stowers *claim*

#### 1. Standing

Although it concedes that an excess insurer, such as Penn National, has standing to assert *Stowers* to the extent that it paid the excess judgment against the insured and thereby became the insured's subrogee, Westport reasons that because Penn National "did not pay $7.7 million of the excess liability [it] was never subrogated to the insured's rights as to that amount;

instead, Westport was." According to Westport, Penn National lacked standing to assert a *Stowers* defense. We are unpersuaded.

Under Texas law, an excess insurer "may bring an equitable subrogation action against the primary carrier" to enforce the primary insurer's *Stowers* duty. *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex. 1992). "Equitable subrogation is the legal fiction through which a person or entity, the subrogee, is substituted . . . to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Am. Ins. Co. v. Assicurazioni Generali SpA*, 228 F.3d 409, 2000 WL 1056143, at *3 (5th Cir. 2000) (unpublished). The burden is on the excess insurer to prove that the primary insurer violated its duty. *Id.* In any case of subrogation, the excess insurer cannot recover more from the third party than what it paid. *Associated Int'l Ins. Co. v. Scottsdale Ins. Co.*, 862 F.3d 508, 510 (5th Cir. 2017) (applying Texas law). "When an insurer pays out on its insured's loss, it becomes a 'pro tanto owner' of the cause of action." *Concierge Nursing Ctrs., Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 45 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (quoting *Thoreson v. Thompson*, 431 S.W.2d 341, 347 (Tex. 1968)).

Here, Penn National is subrogated to IA's *Stowers* rights. As the district court indicated, Penn National paid $379,885.78 to Highport on IA's behalf to complete the fulfillment of IA's obligation on the balance the district court determined was due to Highport in July 2016. The district court held that "[b]y virtue of having fulfilled an obligation for which IA was responsible, Penn National was substituted to IA's rights under the *Stowers* doctrine." As the district court presented, "[n]o legal authority supports the idea that an excess insurer must pay the entire amount of a judgment in excess of the primary insurer's policy limits in order to be equitably subrogated to an insured's *Stowers* claim." Specifically, the district court

highlighted that such a legal holding "would severely undermine both the *Stowers* doctrine and the purpose of equitable subrogation." We agree.

Westport would have us adopt its conclusion that "an excess insurer obtains standing to assert *Stowers* by" first paying the entire amount of the judgment and then seeking reimbursement. But such a holding would undermine the protections that the *Stowers* doctrine affords insureds. Because no Texas court has ruled on this issue in the *Stowers* context, we must make an *Erie* guess. *Am. Guarantee & Liab. Ins. Co. v. ACE Am. Ins. Co.*, 990 F.3d 842, 848 (5th Cir. 2021) (citing *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 764 (5th Cir. 2019)). The *Stowers* doctrine encourages the *prompt* settlement of claims, while simultaneously protecting insureds from having to pay any money out of their own pockets, and aims to protect insureds against the risk of jury verdicts resulting in judgments in excess of their policy limits. Thus, according to Texas caselaw, Penn National has standing to bring a *Stowers* claim in the instant case and its contentions to the contrary are meritless.

### 2. Stowers *Prerequisites*

Westport contends that, as a matter of law, none of the Highport settlement demands[7] meet the *Stowers* prerequisites, namely (1) the demands do not "propose to release the insured fully in exchange for a stated sum of money," *Trinity Universal Ins. Co. v. Bleeker*, 966 S.W.2d 489, 491 (Tex. 1998); (2) the demands do not constitute "an unconditional offer to settle within policy limits," *State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 41 (Tex. 1998); and (3) the terms of the demands are not "clear and

---

[7] Particularly, Westport pinpoints the September 2009 demand and the July and November 2010 demands. The district court determined at summary judgment that the May 2010 demand could not provide a basis for liability and at the close of trial that the May 2009 demand did not provide a reasonable opportunity to settle as a matter of law.

undisputed," *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 77 S.W.3d 253, 263 (Tex. 2002).

### a. The CRC Indemnity Claim

Westport argues that it was entitled to judgment as a matter of law on Penn National's *Stowers* claim because the Highport settlement demands did not provide for settlement and release of the CRC indemnity claim. Westport maintains on appeal that it declined to accept the September 2009, July 2010, and November 2010 demands because it believed that the offers, if accepted, left IA exposed to further indemnity liability for the very same incident the proposed settlement was supposed to resolve.

Specifically, Westport complains that the September 2009 demand created exposure for IA because "it would have remained at risk for any additional amount Highport recovered from CRC, without the protection of the one-satisfaction rule or any control over the amount of that settlement." In response, Penn National accuses Westport of crafting this argument as an ex-post justification for its failure to settle the Highport litigation within primary policy limits. Penn National contends that at the time the September 2009 demand was tendered, Westport had no concerns about the CRC indemnity claim as illustrated by the comments proffered by Westport's appointed counsel, Oldenettel, in which he communicated to IA that he did not believe a potential indemnity claim "to be applicable under the facts of this case." Moreover, Penn National maintains that an actual, formal demand for indemnity by CRC was not filed until September 13, 2010—well after four of the five settlement demands were offered.

Under Texas law, the *Stowers* duty requires an insurer "to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits." *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 843 n.2 (Tex. 1994) (citing *Stowers*, 15 S.W.2d 544). The *Stowers*

duty is activated by a settlement demand when: (1) the claim against the insured is within the scope of coverage, (2) there is a demand within policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *Tex. Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312, 314 (Tex. 1994). For *Stowers* to apply in this case, Highport's settlement offers must have met the three aforementioned *Stowers* prerequisites, in addition to "clearly stat[ing] a sum certain," and being "unconditional." *Soriano*, 881 S.W.2d at 314; *Rocor Int'l*, 77 S.W.3d at 263; *Danner v. Iowa Mut. Ins. Co.*, 340 F.2d 427, 429–30 (5th Cir. 1964) (applying Texas law).

In its order denying Westport's Rule 50(b) motion, the district court rejected Westport's argument that the September 2009, July 2010, and November 2010 settlement offers did not address the risk of future liability that IA faced from an indemnity claim against CRC. Specifically, the court reasoned that at the time Highport made the September 2009 *Stowers* demand, CRC had not asserted a claim against IA. Indeed, CRC never made such a claim, but instead IA brought a third-party claim against CRC and CRC filed an answer. Only then, in that answer, did CRC reference the indemnity provision as a defense to IA's claims against it. The district court denied Westport's Rule 50(b) motion regarding the July and November 2010 demands on a similar ground. Further, the district court explained that any indemnity claim asserted by CRC would arise out of a separate and distinct contract dispute. That dispute concerned whether the Brokerage Agreement between CRC and IA did in fact indemnify CRC against liability, not whether IA (acting as Lloyd's insurance agent) failed to procure the requested insurance coverage to protect Highport's marina in violation of Lloyd's insurance contract with Highport. The district court reasoned that a full release under *Stowers* does not require "the release of potential, unasserted,

and distinct claims made by third parties" like CRC. We agree. We cannot square Texas Supreme Court precedent interpreting *Stowers* with the desired-for holding that an insurer may characterize a settlement demand—that does not overtly consider separate and distinct contract disputes—as not amounting to a full and complete release for the insured. We shall not immunize primary insurers from exposure to liability under *Stowers* for simply invoking claims that would have arisen out of separate and distinct contract disputes.

Westport argues that *Danner v. Mutual Insurance Company* squarely addresses *Stowers* in the context of indemnity liability not released by the settlement demand. 340 F.2d at 430. We disagree. The instant case is unlike *Danner*. In *Danner*, Kurt Burmester was injured in a collision with an engine operated by the Houston Belt and Terminal Railway Company ("Belt") while driving an automobile owned by, D. D. Danner and J. W. Maxcey, a partnership d/b/a Danner Marine Guard Service ("Danner"). *Id.* at 428. At the trial, Danner and Belt were held jointly and severally liable to Burmester for his injuries. *Id.* Danner carried liability insurance with Iowa Mutual. *Id.* While the case was pending on appeal, Danner's and Burmester's lawyers—without Belt's—arrived at a proposed settlement of $62,000, to be paid by Danner in return for a covenant not to sue. *Id.* However, Iowa Mutual refused to accept the settlement on the ground that the offer was conditional. *Id.* The district court ultimately concluded that Burmester's offer was not a valid *Stowers* demand. *Id.* at 428–29.

Affirming the district court, this court determined that the offer did not unconditionally protect Danner and Iowa Mutual "fully . . . against further liability to [Belt] in the event that [Belt] secured a judgment of indemnity from [Danner], including direct liability, or any costs, expenses or attorneys' fees expended in resisting such claims even in the event same turned out to be without merit.'" *Id.* at 429–30.

*Danner* is dissimilar to this case. Westport hangs its proverbial hat on our language acknowledging, pursuant to the facts of that case, the possibility of one co-defendant obtaining a judgment of indemnity against another co-defendant. But *Danner* involved the potential for a claim of common law indemnity, not the enforcement of a contractual indemnity clause. *Id.* at 428, 430. Here, however, CRC and IA negotiated such a contractual indemnity clause as part of the Brokerage Agreement.

In *Danner*, a finding of joint and several liability at trial allowed Burmester to collect his damage award, $173,396.05, from any one of the joint tortfeasors—Belt or Danner. 340 F.2d at 428. The trial court provided for contribution and denied indemnity. *Id.*[8] Contribution is applicable where defendants are jointly and severally liable. Under the contribution doctrine, a defendant who is subject to a judgment can raise a contribution claim against a liable co-defendant, if he compensates the plaintiff for more than his share of responsibility. Equitable indemnity, too, governs the allocation of damages among multiple tortfeasors who are jointly and severally liable. "Under the common law doctrine of indemnity, the tortfeasor who is entitled to indemnity receives total reimbursement from another tortfeasor for damages paid to plaintiff . . . shifting total responsibility for a tort from one party to another." *B & B Auto Supply, Sand Pit, & Trucking Co. v. C. Freight Lines, Inc.*, 603 S.W.2d 814, 816–17 (Tex. 1980). Thus, in *Danner*, the parties

---

[8] Because there was no mention of a contract between Belt and Danner, implied contractual indemnity was off the table. At most, the defendants could have pursued common law indemnity. Still, according to the Texas Supreme Court, "[u]nder the common law, as a general rule, joint tortfeasors have no right of indemnity among themselves. That rule rests on considerations of public policy, it being against the policy of the law to adjust equities between wrongdoers[.]" *Austin Rd. Co. v. Pope*, 216 S.W.2d 563, 564–65 (Tex. 1949).

would have been seeking contribution or common law indemnity and not enforcing a contract dispute.[9]

Unlike *Danner*, our case involves a negotiated contractual indemnity clause, not the doctrine of common law indemnity. Contractual indemnity under an insurance contract is separate and distinct from indemnity principles governing apportionment of fault between joint tortfeasors. *Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co.*, 410 F.2d 178, 181 (5th Cir. 1969). A party asserting equitable indemnity is not asserting that a contractual right to indemnity exists; rather, such a party is asserting that, given the special nature of the case's circumstances, equity demands that one party indemnify the other. *Id.* Westport cites no case that extends *Danner*'s holdings about equitable indemnity obligations among jointly liable tortfeasors to negotiated contractual indemnity agreements among insurance companies. This court rejects Westport's invitation to expand Texas law in its effort to overturn the findings of a jury.

Moreover, we have stated that "[u]nder the *Stowers* doctrine, the requirement for an unconditional settlement offer generally refers to a release of the causes of action asserted in the underlying litigation, in this case, the personal injury claims by the [injured] plaintiffs." *Assicurazioni Generali*, 2000 WL 1056143, at *3. The operative terms here are "release of causes of

---

[9] The equitable remedies of contribution and indemnity, among co-tortfeasors, often go hand-and-hand. Historically, Texas has either through common law or by statute allowed tortfeasors to receive contribution from co-tortfeasors. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 426–27 (Tex. 1984). Occasionally, Texas courts have analyzed when one tortfeasor is entitled to indemnity over and against another tortfeasor pursuant to non-contractual (or equitable) indemnity. *See Gen. Motors Corp. v. Simmons*, 558 S.W.2d 855, 859 (Tex. 1977); *Austin Rd. Co.*, 216 S.W.2d at 565. Relevant here, since the 1964 *Danner* case, Texas has since abolished the common law doctrine of indemnity between negligent joint tortfeasors. *Cypress Creek Util. Serv. Co. v. Muller*, 640 S.W.2d 860, 864 (Tex. 1982); *B & B Auto Supply*, 603 S.W.2d at 816–17.

action asserted in the underlying litigation" and "by the [injured] plaintiffs." *Id*. The CRC indemnity claim neither stems from a cause of action asserted in the underlying litigation, nor a claim asserted by the plaintiffs. The record establishes that CRC's February 23, 2009 demand letter made no mention of any claims asserted by Highport.

The third-party complaint filed by IA did not give rise to any obligation on Highport's part to resolve the contract dispute between IA and CRC. Westport complains that the September 2009 demand, in particular, did not release Highport's claims against CRC, in which Highport sought recovery for the same damages it sought from IA based on the same coverage defect. Such an argument suggests that to qualify as a full release of liability, the September 2009 demand was required to release CRC so that CRC would have released its claim against IA for indemnification of any such damages. Notably, IA brought CRC into the litigation as a third-party defendant on February 5, 2009. It was not until April 3, 2009 that Highport asserted claims against CRC—in line with IA's expressed desire. Thus, importing an obligation on Highport to resolve the indemnity dispute between IA and CRC would be incongruous. But, again, CRC and IA's contractual indemnity dispute was separate from a determination and allocation of fault amongst the co-defendants in the Highport suit. CRC was not required to dismiss the CRC claim so that IA could not be pursued for indemnification without first determining which parties were at fault. Even IA's counsel, Oldenettel, admitted that CRC's presence in the litigation as a third-party defendant "was necessary" because IA was unsure where the alleged error was interjected in the supply chain of the insurance procurement.

In addition, Westport complains that "Highport's arbitration award against CRC exceeded Westport's primary policy limits, independent of IA's own liability to Highport." But this further supports the district court's reasoning that the CRC indemnity claim arises out of a separate and distinct

contract dispute. Here, CRC was not a co-insured under the Westport policy; rather CRC was to be the indemnified party under its Brokerage Agreement with IA. Thus, Westport's argument that the CRC claim had to be released by Highport to perfect Highport's *Stowers* demand is unpersuasive.

Lastly, we acknowledge that analyzing the context in which a full and complete release of liability is structured proves to be complicated by factors such as multiple plaintiffs pursuing settlements against a single insured,[10] settlement offers that do not release *all* insureds,[11] unique settlement structures,[12] and medical care providers filing liens on settlements for hospitalization costs.[13] However, none of these factors are present here.

Texas Supreme Court precedent does not support Westport's argument that the September 2009 demand was not a valid *Stowers* demand. *See Garcia*, 876 S.W.2d at 848. As the Texas Supreme Court stated in *Garcia*, "[w]e start with the proposition that an insurer has no duty to settle a claim that is not covered under its policy." 876 S.W.2d at 848. If insurers are not required under their *Stowers* duty to incorporate claims not covered under their policies in their settlement calculus, then they are also not permitted to absorb unrelated claims not covered under their policies to prevent a *Stowers* duty from triggering. *See St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 340 n.5 (5th Cir. 1999) ("*Stowers* does not extend or create coverage when an insurer negligently handles a claim against its insured that is not covered in the first instance."); *id.* at 345

---

[10] *Soriano*, 881 S.W.2d at 315; *Am. Guarantee*, 990 F.3d at 842.

[11] *See OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669 (5th Cir. 2016) (applying Texas law).

[12] *Assicurazioni Generali*, 2000 WL 1056143, at *3.

[13] *Bleeker*, 966 S.W.2d at 489.

("While recognizing the expansive language in *Stowers* regarding an insurer's duty to the insured, we cannot square the Texas Supreme Court's recent precedent interpreting *Stowers* with a holding that the insurer has a duty to consider claims that are excluded from coverage when making its determination of whether a settlement is reasonable."). In *St. Paul Fire & Marine*, we said as much in holding that "[an insurer] had no duty to take into consideration [its insured's] potential exposure to punitive damages during settlement negotiations regarding covered claims." 193 F.3d at 343.[14]

What was true for punitive damages in *St. Paul Fire & Marine* is true here for indemnity clauses in separate contracts with third parties. *See id.* In other words, the Brokerage Agreement's clause requiring IA to "indemnify and hold CRC harmless from any claim asserted against CRC in following the instructions of the" insured was irrelevant for purposes of Westport satisfying its *Stowers* duty.

Thus, we conclude that the district court did not err in holding that Highport's September 2009 letter demanding policy limits in exchange for a full release of its claims against the IA was a valid *Stowers* demand which Westport rejected.

### b. Terms of the Demands

Westport argues that the July and November 2010 demands failed to provide "any terms of any kind other than a dollar amount" and made "no

---

[14] St. Paul insured CSI against damages arising from its negligence, but the insurance policy specifically excluded coverage for punitive damages. 193 F.3d at 341. St. Paul defended CSI in the underlying state lawsuit. *Id.* After rejecting the *Stowers* settlement demands, the jury found CSI liable for negligence and gross negligence and awarded the plaintiff, Schultz, $380,000 in actual damages and $850,000 in punitive damages. *Id.* St. Paul paid the actual damages award on behalf of CSI but refused to pay the punitive damages award based on an exclusion in the policy. *Id.*

mention of any release." However, the record belies its assertion. The dispositive issue before us is whether a common understanding of Highport's 2010 counteroffers included the release of IA from any future liability.

Redeker's testimony and other evidence resolves this issue. He testified to common practices and his understanding of the CRC indemnity claim. When considering whether to accept Highport's offers, Redeker admitted that Westport was not concerned with any future liability stemming from the CRC indemnity claim. At trial, Redeker made no mention of any belief that the mediator's proposed settlement agreement lacked a full and unconditional release. He further testified that, in the calculus of his settlement decision-making, the mediator's proposed settlement agreement amounted to "a global release . . . tak[ing] care of the indemnity claim that [was] being made by CRC against our insured [IA]. This would end this case for [IA]." Specifically, the first paragraph of the mediator's proposed settlement agreement stated:

> For and in consideration of the settlement, mutual release, and dismissal of any and all claims, either pending or which could be asserted in the future, in any forum or jurisdiction whatsoever, arising out of the events and actions made the subject of the captioned cause of action, including cross-actions, third-party actions, or other indemnity claims, the parties hereto and their insurers agree and bind themselves to the following terms.

Correspondingly, the magistrate judge's memorandum and recommendation, which the district court acknowledged and adopted, correctly advised that "the course of communications and continuing settlement efforts, could allow a reasonable jury to find that the terms and conditions were clear with regard to the oral $3.6 million settlement demands of July and November 2010." As was the case in *Assicurazioni Generali*, this language "tends to suggest that no potential liability on the part of [the

insurer] or the insured would remain upon acceptance of the offer." 2000 WL 1056143, at *3. To that end, the jury was instructed that it could:

> [C]onsider all of the relevant circumstances at the time, including but not limited to the likelihood and degree of [IA's] potential exposure to a judgment in excess of Westport's policy limits, the likelihood of obtaining a full release of the Highport's claims against [IA], the clarity of the settlement demand, the position of the insured regarding settlement, and whether the demand is unconditional.

On appeal, Westport continues to argue that the July and November 2010 demands did not propose a full and unconditional release. However, we agree with the district court's assessment that "there was legally sufficient evidence to support the conclusion that the July and November 2010 demands were extensions of the [mediator's proposed settlement agreement] (from 2009 and 2010) and carried with them the same terms and conditions as the [proposal]." Westport's explanation of its understanding of Highport's demand at trial belies its current argument that the July and November 2010 demands lack clear and undisputed terms and do not propose a full and unconditional release.

We thus conclude that the district court did not err in holding that Highport's July and November 2010 demands in exchange for a full release of its claims against the IA were valid *Stowers* demands which Westport rejected.

### c. May 2009 demand

On cross appeal, Penn National contends that the May 2009 demand was within the scope of coverage and that the terms of the settlement demand were such that an ordinarily prudent insurer would accept it. Penn National maintains that it introduced ample evidence at trial supporting the jury's finding that Westport breached its *Stowers* duty as to the May 2009 demand.

It contends that, as a result, the district court erred in setting aside the jury's verdict on this question. We hold that the evidence underlying the district court's legal conclusions support its determination.

At summary judgment, the magistrate judge summarily acknowledged that:

> The Fifth Circuit has not set a minimum threshold for finding the amount of time given to respond to be reasonable as a matter of law but, rather, considers the reasonableness of the amount of time within the context of the demand. In *Assicurazioni Generali*, the Fifth Circuit considered whether a demand presented during an afternoon recess six days into a trial that was set to expire just under twenty-three hours later provided a reasonable opportunity to settle. *See* [*Assicurazioni Generali*, 2000 WL 1056143, at *1–2] . . . The Fifth Circuit determined that whether the insurer acted reasonably in not accepting the plaintiffs' offer was a fact question not amenable to summary judgment. *Id.* at *6.

Additionally, the Supreme Court of Texas has elaborated that the ultimate *Stowers* issue is "whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it." *Garcia*, 876 S.W.2d at 849. In *Assicurazioni Generali*, this court interpreted "reasonable opportunity" to have both substantive and procedural components; "the former refer[s] to the reasonableness of the terms of the offer, and the latter concern[s] the amount of time to either accept or reject the offer given the consequences of the decision." 2000 WL 1056143, at *5. Westport averred that four aspects of the circumstances surrounding negotiations and mediation demonstrated that it did not have a reasonable opportunity to settle on May 20, 2009: namely, (1) the Highport lawsuit was in the preliminary stages; (2) very little discovery had taken place; (3) IA had not had the opportunity to evaluate the merits of the parties' positions; and (4) the time limit for a decision was forty-five minutes.

Although reasonableness is a fact question, the district court determined that the evidence adduced at trial did not support the jury's conclusion. Specifically, it held that there was no legally sufficient evidence that Westport acted unreasonably in not accepting the May 2009 offer. Because, as Westport averred, IA had not had the opportunity to evaluate the merits of the parties' positions and there was a forty-five-minute time limit for IA to reach a decision, we agree.

### C. Jury Charge

#### 1. Correct Statement of the Law

Westport challenges the district court's jury instructions. The jury charge instructed the jurors on the requisite *Stowers* elements, stating that:

> To prevail on its respective claims, Penn National must prove by a preponderance of the evidence each of the following [three elements]:
>
> (1) The settlement demand was within the policy limits of the Westport Insurance Policy insuring [IA];
>
> (2) The settlement demand fully released [IA]; and
>
> (3) An ordinarily prudent insurer would have accepted the demand.

It also stated that "[a]ll three elements must be proven as to each date [of a settlement offer] for [the jury] to find that the burden of proof was satisfied as to that question." In a subsequent explanatory paragraph, the charge further directed the jury that:

> When considering these [three elements], you should consider all of the relevant circumstances at the time, including but not limited to the likelihood and degree of [IA's] potential exposure to a judgment in excess of Westport's policy limits, the likelihood of obtaining *a full release of the Highport's claims against [IA]*, the clarity of the settlement demand, the position

of the insured regarding settlement, and whether the demand is unconditional.

Westport argues that the district court—at Penn National's urging—erred by changing the language in the explanatory paragraph from instructing the jury to consider "the likelihood of obtaining a full release of *the claims* against IA" to instructing the jury to consider "the likelihood of obtaining a full release of *Highport's claims* against IA." "We review challenges to jury instructions for abuse of discretion and afford the trial court great latitude in the framing and structure of jury instructions." *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014). Under this standard, "[w]e will reverse the district court's decision only if the requested instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Cooper Indus., Inc. v. Tarmac Roofing Sys.*, Inc., 276 F.3d 704, 714 (5th Cir. 2002)). We hold that Westport has failed to establish these elements and, thus, has failed to show that the district court's failure to implement its requested instruction merits reversal.

Westport's argument that the district court's jury instructions failed to feature "*all* claims against IA" as a focal point to the *Stowers* duty—notwithstanding if those claims were asserted by other claimants or co-defendants—misstates the *Stowers* duty's scope. The Texas Supreme Court has clarified that settlement offers must "clearly state a sum

certain,"[15] be "unconditional,"[16] and cannot "carry[] risks of further liability."[17] Because any potential obligation IA owed to CRC did not bear on Highport's offers to IA, that obligation could not have invalidated Highport's *Stowers*-compliant offers, which were unconditional and did not carry any risk of future liability. As such, we hold that the district court's jury instructions were correct statements of law.

Furthermore, Westport's requested instruction was substantially covered in the charge as a whole. This court has explained that "in submitting [a *Stowers* question] for the jury's decision, every factor entering into its determination should be clearly and fairly presented." *Fid. & Cas. Co. of N.Y. v. Robb*, 267 F.2d 473, 476 (5th Cir. 1959). Notably, Westport's preferred jury instruction was still included in the elements that Penn National was required to prove by a preponderance of the evidence. Even Westport concedes this by arguing that the jury "might have read these instructions to allow it to also consider the CRC claims" because the jury instructions explicitly instructed the jurors that "[w]hen considering these questions, you should consider all of the relevant circumstances at the time[.]"Consequently, Westport has failed to demonstrate that failure to instruct the jury on the CRC indemnity claim seriously impaired its ability to present a given defense.

Westport argues that "[w]hether Highport's settlement offers would have released the CRC claims was relevant to the likelihood and degree of IA's potential exposure to an excess judgment." Fortunately, Westport had the opportunity to present these considerations at trial. Indeed, beginning

---

[15] *Rocor Int'l, Inc.*, 77 S.W.3d at 263.

[16] *Danner*, 340 F.2d at 429–30.

[17] *Id.*

with its opening statements, Westport made clear throughout the trial its view that "the resolution of CRC's indemnity claim" was a relevant issue in its settlement decision-making "that came into play with respect to the first two demands."

Still, both Penn National and the district court point to contradictory evidence supporting the jury's finding. For example, contemporaneous claim notes between Redeker and Oldenettel—recorded five days before the first mediation in May 2009—reveal that Westport did "not believe the indemnity paragraph to be applicable under the facts of this case." *see Am. Guarantee*, 990 F.3d at 850. Moreover, the jury heard credible evidence that it was over one year later, on September 13, 2010, when CRC actually asserted a claim against IA, and it did so in a parallel arbitration between Highport and CRC. In its third-party demand against IA for breach of the Brokerage Agreement, CRC explained that "[a]s a result of [IA]'s wrongful failure to comply with its obligations under the CRC Brokerage Agreement," it was forced "to file an Opposed Motion to Compel Arbitration, Motion to Stay, and Motion to Stay Discovery against [IA] in the federal court lawsuit." Thus, dissimilar to *Robb*, the evidence of the CRC indemnity claim was not "completely exclude[d] from the jury's consideration." *See* 267 F.2d at 476. Even if we concluded that the CRC indemnity claims were a relevant consideration for Westport in making its settlement decisions, the jury charge was a correct statement of law. Under the jury instructions, the jury was free to include the CRC indemnity issue as one of the "relevant circumstances" in the district court's explicitly nonexhaustive list of relevant considerations.

For these reasons, we conclude that the district court's jury instruction "substantially covered" Westport's preferred instruction and did not misstate the law. *Wright*, 634 F.3d at 775. Thus, the district court did not err in instructing the jury. Moreover, even if the district court erred by

not listing the CRC indemnity issue as a relevant consideration in the *Stowers* analysis, that error would be harmless here because the jury was free to consider the heavily litigated CRC issue under the broad language of the instructions.

### 2. Closing Arguments

Westport insists that Penn National's closing arguments about the jury instruction injected error into the jury's verdict. Westport contends that "during its closing arguments, Penn [National] repeatedly pointed to the objected-to instruction and told the jury that it meant that the copious evidence Westport had presented about the CRC indemnity issue was an 'irrelevant' 'side show' because under the [district court's] jury instructions, 'all that matters, and [the jury charge] states it expressly, is [whether the settlement demand allows for] an unconditional release from the claims of Highport . . . not CRC." Westport avers that "Penn [National] later reiterated this point, asserting again that under the jury charge, the jury was to consider 'the likelihood of obtaining a full release of the . . . the Highport claims against [IA]. Not CRC's.'"

We acknowledge that litigants may use their closing argument only "to assist the jury in analyzing, evaluating and applying the evidence." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). Thus, it was permissible for Penn National to utilize its closing argument to argue that the evidence did not support Westport's contention that the CRC indemnity claim overwhelmingly factored into its failure to accept Highport's settlement demands. Still, "to the extent that the context could alter the effect of an isolated remark, we must also consider the prejudicial effect of the remarks taken together." *United States v. Smith*, 814 F.3d 268, 276 (5th Cir. 2016). Notably, Westport acknowledges that it still discussed the CRC evidence in its opening and closing arguments. And the plain text of the jury

instruction does not state that the jury could not consider the CRC indemnity issue. Hence, we hold that the jury was not improperly precluded from considering the CRC indemnity claim when evaluating the reasonableness of Westport's settlement decisions.

Still, Westport complains that it "was unable to tell the jury that the court's instructions did not mean what Penn [National] said [they] meant, as the trial court had ruled for [Penn National] on that very issue, on that very basis." Westport argues that it could not "have objected to Penn [National]'s closing arguments, as they were entirely consistent with the trial court's (erroneous) ruling." That argument is baseless. Notably, Westport does not cite a ruling from the district court holding that it could not object, presumably because no such ruling exists. Plainly put, the district court's decision to reword the jury instructions did not preclude consideration of the CRC indemnity issue, nor did that decision bar Westport from raising an objection to Penn National's closing arguments. If Westport failed to recognize the distinction between the district court's instruction and Penn National's closing arguments about that instruction, that failure is Westport's alone. Because we are unpersuaded by Westport's arguments, we hold that the interest of substantial justice is not at stake in the instant case and that the district court's judgment does not warrant reversal. *See Shipman v. Cent. Gulf Lines, Inc.*, 709 F.2d 383, 388 (5th Cir. 1983) (citation omitted) (holding that arguments that are not objected to are reviewed only in "exceptional cases where the interest of substantial justice is at stake"); *see also Alaniz v. ZamoraQuezada*, 591 F.3d 761, 778 (5th Cir. 2009) ("Improper argument may be the basis for a new trial where no objection has been raised only where the interest of substantial justice is at stake." (alteration adopted) (citation and quotation marks omitted)); *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 276 (5th Cir. 1998) (reversing judgment

based on improper closing argument where the appellant "fail[ed] to object to almost all of the statements now challenged").

Viewed in the light most favorable to the jury verdict, we hold that the evidence was sufficient for the jury to find that "an ordinarily prudent insurer would accept [the settlement demands], considering the likelihood and degree of the insured's potential exposure to an excess judgment." *OneBeacon*, 841 F.3d at 678 (quoting *Garcia*, 876 S.W.2d at 849).

## IV.

The district court's judgment is AFFIRMED. IT IS FURTHER ORDERED that Appellant's opposed motion to strike portions of Appellees' brief is DENIED.